# LOUISVILLE & NASHVILLE RAILROAD COMPANY *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 29. Argued December 4, 1924—Decided March 2, 1925.

1. Contracts for sale and delivery of coal to the United States, *construed,* with the advertisements, specifications and conduct of the parties, as providing for delivery on cars at the mine; so that title passed then and the railroad transportation, on government bills of lading, was subject to land-grant rates. P. 397.
2. Provisions in such contracts for service by the vendor in transferring the coal to barges at railroad destination, compensation therefor to be included in price of coal; and reserving right of United States to test coal after transportation and reject it if

not up to specifications,—*held* not inconsistent with passing of title at time of delivery on cars at the mine. P. 400.

3. Where the United States contracted for coal to be shipped by rail and delivered at a vessel, use of government bills of lading, and payment of freight by the United States at land-grant rates, were not enough to sustain a finding that the coal was the property of the United States when hauled by the railroad. P. 401.

4. When a railroad company, entitled to charge the United States the full tariff rate, charges and receives the reduced land-grant rate with full knowledge of the facts, it is bound by its acquiescence and cannot recover the difference. *Id.*

5. Where, under its tariff, the right of a railroad to charge extra for switching and transferring coal at destination depends upon road-haul revenue being equal to as much as a stated rate per ton, land-grant deductions from the latter allowed the United States are not to be considered in determining its liability to such extra charges. P. 402.

57 Ct. Cls. 268, affirmed.

APPEAL from a judgment of the Court of Claims rejecting the Railroad's claim for transportation, switching and handling of freight for the United States.

*Mr. Benjamin Carter,* for appellant.

*Mr. Blackburn Esterline,* Assistant to the Solicitor General, for the United States, submitted.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This action was brought in the Court of Claims to recover the amount by which tariff-rate freight charges on certain coal were reduced by government land-grant deductions; and also to recover certain charges for switching and handling. The court made findings of fact, and gave judgment for defendant. 57 Ct. Cls. 268. One of the lines of appellant's railroad enters Alabama from the north and extends southerly through Decatur, Birmingham and Flomaton to Pensacola, Florida, and thence easterly to River Junction, Florida. This is a land-aided

line. Appellant has another line extending southwesterly from Flomaton to Mobile. At Mobile and Pensacola, it owns wharves and hoists for transferring coal from cars to boats, and has constructed switches from its main line to the wharves. All of these were built without government aid. The wharves and hoists at Mobile are operated by a coal company and those at Pensacola by appellant.

All the coal in question came from mines in the Birmingham district and was purchased by the United States for engineering work at Mobile, Pensacola and other places on or near the Gulf, except 250 tons bought for the use of the U. S. S. *Tonopah*. It was transported on government bills of lading and was carried in whole or in part by the use of such land-aided railroad. The coal was furnished to the United States under a contract with the Gulf States Coal Company of March 15, 1915, a contract with the Imperial Coal and Coke Company of August 21, 1916, advertisements, specifications, bids and acceptances without formal contracts between November 2, 1914 and September 10, 1917, and a bid and acceptance as of April 8, 1915, for the *Tonopah*.

The Court of Claims held that all shipments, except those made under the contract of March 15, 1915, were subject to land-grant deductions. Appellant maintains that none was subject to the reduced rates. We are of opinion that all the coal, except that furnished the *Tonopah*, was delivered to and became the property of the United States before it was hauled by appellant, and was entitled to the reduced rates.

The general rule is that, if a consignee accepts a shipment, he becomes liable as a matter of law for the full amount of freight charges. *Louisville and Nashville R. R.* v. *Central Iron Co.*, 265 U. S. 59, 70; *Pittsburgh, &c. Ry. Co.* v. *Fink*, 250 U. S. 577, 580. Under the land-grant acts, the United States was entitled to the reduced

rates if the coal when hauled was its property. Acts of
May 17, 1856, June 3, 1856, and March 3, 1857, 11 Stat.
15, 17, 200; Acts of April 10, 1869, and March 3, 1871,
16 Stat. 45, 580; Act of March 3, 1875, 18 Stat. 509.
*Illinois Central R. R.* v. *United States,* 265 U. S. 209.
But the mere use of government forms of bills of lading
is not conclusive on the question of ownership of property
at the time of transportation, and does not give the
United States the right of transportation at land-grant
rates. See *Transportation Involved in Furnishing Articles by Contractor,* 20 Comp. Dec. 721, 723.

The contract of March 15, 1915, was made pursuant to
advertisement and specifications. The specifications,
which were attached to and made a part of the contract,
show that, in order to permit the United States to take
advantage of land-grant rates, the form of proposal contemplated either " delivery of the whole quantity at the
mine, from which shipment will then be made on Government bill of lading to Mobile, Pascagoula, or Gulfport, as may be necessary, or delivery of about 7,000 tons
at Mobile, Ala., about 5,000 tons at Pascagoula, Miss.,
and about 6,000 tons at Gulfport, Miss." And it was
specified: " The United States will select the method of
delivery which under the proposals received proves to be
most economical and advantageous. If mine delivery is
selected, the coal will be ordered in carload lots for shipment on Government bills of lading to be furnished by
the contracting officer, but the contractor will be required to transfer it from cars to barges belonging to the
United States and will therefore include in his price his
cost for so transferring the coal at all three points of delivery. . . . If prices based on delivery at Mobile,
Pascagoula, and Gulfport prove to be more advantageous,
then these prices will be accepted and order will be given
for carload lots or less as may be required on board
United States barges or in bunkers " at the three places

named.  The contract contains the following: " In conformity with ,the advertisement and specifications hereunto attached, which form a part of this contract, the said contractor shall furnish and have delivered on United States barges, or in bunkers, from hoists, in carload lots, at Mobile, Alabama, when requested, eighteen thousand short tons, more or less.  .  .  .  Coal to be shipped on Government bill of lading, to be furnished by the contracting officer, the United States to pay railroad freight charges between Dixiana [where the mines were located] and Mobile and the contractor to provide for transferring the coal from cars to United States barges and to pay all demurrage charges that may accrue."  The United States reserved the option to call on the contractor to tow the coal from Mobile to Pascagoula and Gulfport and agreed to make additional payments for that service, and also reserved the right to inspect and test the coal after transportation and to reject such as did not conform to specifications.  The purchase price was to be paid after delivery and final acceptance.

The language " shall furnish and have delivered on United States barges  .  .  .", if it stood alone, might be taken to indicate that delivery was to be made after transportation.  But when read, as it must be, with the advertisement and specifications, and in the light of what was done, it appears with reasonable certainty that delivery at the mines was contemplated.  The specifications distinctly show that, if mine delivery should be selected, the coal would be ordered in carload lots and shipped on government bills of lading.  In harmony with that provision, the contract required shipment in carload lots on forms of bills of lading furnished by the contracting officer, and bound the United States to pay freight charges from the mine to Mobile.  This meant that the contractor was not to be concerned with or responsible for the transportation by rail.  But, if delivery

at gulf ports had been selected, the contractor would have been bound to hire the carrier and to pay the freight. The provisions of the contract and specifications together amount to a declaration of the parties that there was to be delivery of the whole quantity at the mine, and the conduct of the parties was in harmony with that purpose and inconsistent with an intention that delivery to the United States should be made after transportation by rail was ended. The general rule is that title passes from seller to buyer with the delivery of the goods. All the coal except that furnished the *Tonopah* was delivered by the seller to the United States at the mines on board railroad cars of appellant, a common carrier designated by the United States by the furnishing of government bills of lading. It must be held that title passed at the time of such deliveries. See *United States* v. *Andrews*, 207 U. S. 229, 240, 243.

The contract contemplated service by the contractor, as well as the sale of coal. The contractor agreed to have the coal transferred from cars to government barges, his compensation therefor to be included in the price, and agreed for specified prices to tow it to points on the Gulf coast, if requested so to do, and also undertook to furnish and deliver at various places some 9,000,000 gallons of fresh water for steam and drinking purposes. The services were not essential to or part of the sale, and, as against the other facts found, the agreements to transfer and tow the coal do not indicate that the parties intended that delivery by the seller to the purchaser should not be made until after transportation. *Hatch* v. *Oil Co.*, 100 U. S. 124, 137; *McElwee* v. *Metropolitan Lumber Co.*, 69 Fed. 302, 305; *H. Baars & Co.* v. *Mitchell*, 154 Fed. 322, 326.

The United States reserved the right to inspect and test the coal after transportation and to reject it, if found not to conform to specifications. None of the coal was

rejected. This right was not inconsistent with transfer of title to the United States at the time of delivery of the coal on cars at the mine. *Delaware, Lackawanna & Western R. R.* v. *United States,* 231 U. S. 363, 371, 372; *Illinois Central R. R.* v. *United States, supra.*

By the contract of August 21, 1916, the seller expressly agreed to deliver the coal on railroad cars at the mines at Dixiana. Deliveries of the coal furnished without formal contracts were covered by specifications which were the same as those forming a part of the contract of March 15, 1915.

The conclusion that the coal furnished the *Tonopah* was to be delivered at the mine is not sustained by the facts found. Under the invitation to bid, proposal and acceptance, delivery was to be made alongside the vessel at Pensacola. The coal was transported on government bills of lading. The United States paid the freight less land-grant deductions. The use of government bills of lading and the payment of reduced charges by the United States are not sufficient to sustain a finding that the coal was the property of the United States when hauled by appellant. There is nothing to indicate that title passed before delivery at the vessel.

We agree with the Court of Claims that acceptance of payment of the land-grant rates concludes appellant. Its conduct was inconsistent with an intention to claim the amount of land-grant deduction, as to any of the coal. Appellant rendered bills as to the coal furnished under the above mentioned contracts of March 15, 1915 and August 21, 1916, upon which it stated the basic rate and the amount to be deducted on account of land grant, and claimed the net remaining after the deduction. There was no evidence tending to show that, in presenting its bills at land-grant rates, appellant did not act with full knowledge of all the facts. Settlements for transporting some of the coal were made after the commencement of

42684°—25——26

this suit, April 26, 1916, but before the amended and supplemental petition was filed, January 9, 1922. Appellant did not protest against any land-grant deductions. It is bound by its acquiescence and consent and cannot recover the amounts deducted. *Oregon-Washington R. R. Co.* v. *United States,* 255 U. S. 339, 345; *New York, New Haven & Hartford R. R.* v. *United States,* 251 U. S. 123, 127; *New York, New Haven & Hartford R. R.* v. *United States,* 258 U. S. 32; *Louisville & Nashville R. R.* v. *United States,* 258 U. S. 374.

The Court of Claims was right in disallowing additional pay for switching cars to wharves or for transferring coal from cars to boats. The tariff rates on this coal for bunkerage and purposes other than export or coastwise traffic were $1.10 per short ton via Flomaton to Mobile or Pensacola. Under the tariff the cost of transferring such coal from cars to vessels at Mobile and Pensacola was assumed by appellant, where the road-haul revenue was $1 per ton or more; but if such revenue was less there was an additional charge of ten cents per ton, plus $2 per car for switching, subject to a maximum of $1 per ton. After land-grant deduction, the balance to be paid in money was less than a dollar per ton. But the land grant, made many years ago in aid of the railroad enterprise, was not a mere gift or gratuity. See *Burke* v. *Southern Pacific R. R. Co.,* 234 U. S. 669, 679. The carrier's obligation to haul property of the United States at reduced rates was a part of the consideration for which the land grant was made. Part of appellant's compensation for hauling the coal was paid in land, and the balance was paid in money. It cannot be said that the total was less than a dollar per ton.

*Judgment affirmed.*