## PACIFIC COOPERATIVE POULTRY PRODUCERS v. UNITED STATES.
### No. 47362.

United States Court of Claims.
July 10, 1950.

R. R. Bullivant, Portland, Or. for the plaintiff.

Pope, Ballard & Loos, and Alexander M. Heron, all of Washington, D. C., on the brief.

William A. Stern II, Washington, D. C., with whom was Assistant Attorney General H. G. Morison, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

Plaintiff sold to the defendant 31,896 cases of eggs at "the applicable ceiling price" established by the Office of Price Administration. Defendant contends that the applicable ceiling price was the ceiling price on the date the plaintiff made its offer of sale and it was accepted. Plaintiff, on the other hand, says that the applicable ceiling price is the price on the date of delivery.

On June 14, 1943, plaintiff wired the defendant offering to sell 1,800 cases of processed storage eggs in the warehouse of the Merchants Ice & Cold Storage Company in San Francisco "at the applicable OPA ceiling prices for the respective grades," and "subject FSC 1470." On the same day it also offered to sell defendant 30,096 cases of processed storage eggs of various grades f. o. b. Vancouver, Washington, "at the applicable OPA ceiling price for the respective grades," and also "subject FSC 1470." These latter eggs were on storage at Albany, Oregon, and at Portland, Oregon. They were offered f. o. b. Vancouver, since the ceiling price at Vancouver was higher than the ceiling prices at Albany and Portland, some error having been made in fixing ceiling prices at these latter cities.

Both of plaintiff's offers were accepted on the following day, June 15, 1943.

FSC–1470, subject to which the offers were made, was an announcement of the Food Distribution Administration of the

Department of Agriculture that it would receive and consider offers for the sale of shell eggs. Since the offer was made subject to its provisions, it would seem to be controlling in the determination of the issue between the parties, that is, whether the price to be paid for the eggs was the ceiling price at the time the offer was made and accepted or the ceiling price at the time of delivery.

The defendant filed an answer and counterclaim in which it contended that the title to the eggs passed at the time the offer was made and accepted and, therefore, that the ceiling price as of that date controlled. This position, however, was not mentioned in defendant's brief; instead, it there insisted that because of the provisions of paragraph 10 of FSC–1470 the ceiling price at the time the offer was made and accepted was the price agreed upon.

The first sentence of this paragraph reads: "Offerer represents and warrants that the price or prices of the commodity to be furnished hereunder, do, not exceed any existing applicable maximum price or prices established by the Office of Price Administration." Defendant says that in making the offer subject to this provision the plaintiff necessarily made it on the basis of applicable maximum prices existing at the time the offer was made. It says that "existing" ceiling prices mentioned or referred to in the offer means ceiling prices existing at the time the offer was made.

It further says that the soundness of this position is demonstrated by the second sentence of paragraph 10, which reads: "In the event such price or prices of the commodity shall, by the time of delivery, exceed any applicable maximum price or prices hereafter established by the OPA, the vendor shall be entitled only to the amount of such established maximum and shall refund to the Government all moneys received in payment for such commodity in excess of such maximum." It says that this second sentence shows that in the first sentence the plaintiff was offering the eggs at the ceiling price existing at the time of the offer, because the second sentence says that if these prices decline by the time of delivery, the price shall be reduced accordingly.

This position would be sound if there was in existence at the time of the offer a ceiling price as of that date only. However, the Office of Price Administration February 25, 1943, issued MPR 333 fixing the prices of various grades of eggs, not only as of June 15, 1943, the date of the acceptance of the offer, but for every week in the year. The prices so fixed were not changed between the date of the offer and the date of delivery.

Therefore, at the time the offer was made and accepted there were "existing" ceiling prices, not only as of the date of the offer and acceptance, but also as of the date of delivery. This leaves it uncertain whether, when plaintiff offered to sell these eggs at "the applicable OPA ceiling prices," it meant the ceiling prices at the time of the offer and acceptance or at the time of the delivery.

█ We are of opinion that "the applicable OPA ceiling · prices" were those applying when the sale was consummated, and we are further of opinion that the sale was not consummated until the eggs were delivered.

█ In ascertaining whether or not delivery is necessary to consummate a sale, we must, of course, look to the intention of the parties, for that intention governs. Hatch v. Standard Oil Company, 100 U.S. 124, 25 L.Ed. 554; Louisville & Nashville Railroad Co., v. United States, 267 U.S. 395, 45 S.Ct. 233, 69 L.Ed. 678; United States v. Amalgamated Sugar Co., 10 Cir., 72 F.2d 755; Anderson v. Mercado, 1 Cir., 163 F.2d 303; certiorari denied, 332 U.S. 837, 68 S.Ct. 220, 92 L.Ed. 410; Collins et al. v. Fleming, Em.App., 159 F.2d 426.

█ This intention is to be found in the contract documents, consisting of the telegraphic offer and acceptance and FSC–1470, subject to whose provisions the offer was made. Since the offer was made and accepted subject to FSC–1470, this is the governing document.

The fourth sentence of paragraph 3 of this document relating to "quality" reads:

"The FSCC will accept, if tendered for delivery, eggs of lower grades than specified in the offer, but in no event lower than minimum grades specified above, at prices not in excess *on date of delivery,* of established prices for those particular grades and weights by the Office of Price Administration." [Italics ours.] It thus appears that as to lower grades than those specified in the offer, at least, the parties had in mind ceiling prices on the date of delivery, and not on the date of the offer.

Paragraph 6, relating to delivery of the eggs offered for sale, provides that "vendors shall take whatever steps that may be necessary to fully protect the eggs after grading, but prior to delivery to the FSCC, and such protection shall be at vendor's expense." Thus, the Government did not assume ownership of the eggs nor the responsibilities connected with ownership until after delivery. Prior thereto the vendor was charged with responsibility for protecting the eggs and for paying the expense of such protection. Until delivery they did not become the defendant's property, but remained the property of plaintiff.

Paragraph 10, quoted above, provides that if OPA prices are reduced before delivery, the prices in effect, not on the date of the offer, but on the date of delivery shall govern. So, it is evident that ceiling prices at the time of the offer were not to govern, but ceiling prices at the date of delivery, at least if these prices were lowered below existing applicable prices when the offer was made.

Under the circumstances the parties quite naturally had in mind prices on delivery dates, rather than on the date of the offer and acceptance, because a number of things had to be done before the offered sale could be consummated. Plaintiff's offer stated that the eggs had not been inspected by the Food Distribution Administration, nor had they been weighed and, since they were sold according to weight and grade, it was impossible at the time of the offer to fix the price to be paid for them. The sale could not have been consummated until after such inspection. In paragraph 6, under the heading of "delivery", it was stated:

"FSCC will take delivery of eggs within 10 business days after receipt of notice from the vendor that eggs have been graded and are ready for delivery."

After inspection and grading plaintiff was required to give notice of readiness to deliver. After receipt of such notice the defendant issued its delivery order setting out the amount to be delivered and the place of delivery. Following this deliveries were made.

Furthermore, when plaintiff made its offer to sell the 31,896 cases, it had on hand 37,593 cases of eggs and intended to keep 5,697 cases as a "working inventory," which plaintiff was permitted to do under the regulations. These 5,697 cases had not been segregated at the time of the offer, and, therefore, it was uncertain what eggs plaintiff was offering to sell and defendant was agreeing to buy until after inspection and grading and segregation of the eggs plaintiff desired to keep.

Also, paragraph 5 of FSC–1470 required the vendor to pack the eggs and mark the packages. Until after all these things had been done no sale could have been consummated.

We have no hesitation in saying that it was defendant's intention in issuing FSC–1470 to pay ceiling prices at the time of delivery, instead of at the time of the offer and acceptance.

However, the parties' conduct after the offer and acceptance becloud this conclusion.

Plaintiff at first demanded payment for the eggs based on the ceiling prices at the time of the offer and acceptance, and it continued to do this until after April 1944, some eight months after the last eggs had been delivered, when, for the first time, apparently, it claimed ceiling prices as of the delivery dates, instead of the date of offer and acceptance.

Plaintiff's explanation of this is that prior to its offer, its general manager had been informed by the acting head of the Egg Division of the OPA and by the head of the Poultry Department, Poultry and Dairy Division of the Food Distribution Admin-

istration, that these were the prices it was entitled to receive.

It is not surprising the plaintiff relied on what these men said. By a regulation issued on March 22, 1943, and by subsequent amendments, the Food Distribution Administration had prohibited the sale of eggs in storage to any one other than a governmental agency. The Federal Surplus Commodities Corporation became the chief governmental agency for the purchase of eggs, and it offered to do so pursuant to its so-called FSC-1470. An owner of eggs in storage had practically no option but to sell according to the terms prescribed by this governmental agency, and it had to sell them, according to the regulation, prior to June 15, 1943. On the day before this expiration date plaintiff offered its eggs for sale to this governmental agency on the terms prescribed.

On this date plaintiff bowed to the inevitable and decided to take what it could get. Those administering this agency told plaintiff it was entitled to be paid under the regulations on a certain basis and the plaintiff submitted its vouchers accordingly.

Defendant's varying positions were not less inconsistent than plaintiff's. When plaintiff's first voucher was received the parties administering the fiscal affairs of this agency rejected it, on the ground that ceiling prices on the date of the offer and acceptance did not control, since under FSC-1470 defendant had ten days after notice of readiness to deliver in which to accept delivery, and, hence, it said, the prices ten days after the offer and acceptance controlled.

Then the parties got into an argument as to whether plaintiff was entitled to ceiling prices "f. o. b. Vancouver, Washington" for the eggs stored in Oregon.

In the meantime, plaintiff had originally instructed the warehouses where the eggs were stored to charge the defendant with storage charges after June 15, 1943, the date of the offer and acceptance, but later plaintiff paid these storage charges until the date of delivery, but still later the warehouses reimbursed plaintiff for storage charges after June 15, 1943, and collected these charges from defendant.

Finally, plaintiff conferred with representatives of the War Food Administration in Washington in an effort to get its vouchers approved, based upon ceiling prices at Vancouver, Washington, instead of ceiling prices at Portland and Albany, Oregon,—the only point then at issue. At this conference plaintiff was advised that the Solicitor of the Department of Agriculture had ruled that plaintiff was entitled to ceiling prices at the times and places of delivery, but that June 15, 1943 was not the delivery date. What those dates were he, apparently, did not say.

The confusion was normal to the times. Some members of the military services coined a word for it, "snafu", which, translated, means "situation normal, all fouled up."

After the ruling of the Solicitor of the Department of Agriculture, the plaintiff submitted a revised voucher claiming ceiling prices in effect on the delivery dates.

It seems rather plain to us that plaintiff meant to claim all along whatever rights it had under FSC–1470, although it, at first, misconceived those rights. It had no intention to contract contrary to the terms of this document, but relied solely on its terms. On the other side, defendant evidently meant to do the same thing. Both parties insisted on their rights and obligations as therein defined.

Indeed, plaintiff had no alternative under the circumstances but to sell its eggs according to the announcement of the Federal Surplus Commodities Corporation, and its rights are to be determined by this announcement.

As we have said heretofore, we think plaintiff under this announcement (FSC–4170) is entitled to the ceiling price in effect on the date of delivery.

The place of delivery of 30,096 cases of the eggs was Portland and Albany, Oregon, instead of Vancouver, Washington, but plaintiff is entitled to the Vancouver price, notwithstanding delivery at Portland and Albany, because its offer was made f. o. b.

Vancouver, and this offer was accepted by defendant. Defendant had the right to demand delivery at Vancouver, but, instead, it accepted delivery at Portland and Albany, Oregon. Plaintiff has given it the benefit of transportation charges between the three points and this is all defendant is entitled to.

Defendant's counterclaim will be dismissed, and judgment entered for plaintiff in the sum of $82,575.78.

HOWELL, MADDEN, and LITTLETON, Judges, concur.

JONES, Chief Judge, took no part in the decision of this case.