In re PENN–DIXIE STEEL
CORPORATION, Debtor.

THUNDERBIRD MOTOR FREIGHT
LINES, INC., Plaintiff,

v.

PENN–DIXIE STEEL CORPORATION,
Defendant.

Bankruptcy No. 8010472.
Adv. No. 805159A.

United States Bankruptcy Court,
S. D. New York.

Oct. 24, 1980.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for debtor; Ilene P. Karpf, New York City, of counsel.

Gerstein, Queler & Churchill, New York City, for Thunderbird Motor Freight Lines; Robert Churchill, New York City, of counsel.

## MEMORANDUM OPINION

BURTON R. LIFLAND, Bankruptcy Judge.

Defendant in this action, Penn–Dixie Steel Corporation ("Penn–Dixie") is engaged in the production of a diversified line

of fabricated steel products. On April 7, 1980, it filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.[1] The plaintiff, Thunderbird Motor Freight Lines, Inc. ("Thunderbird"), is in the business of moving freight by truck, and is a duly licensed class one common carrier whose operations are subject to the provisions of the Interstate Commerce Act ("ICA"), 49 U.S.C. § 10101 *et seq.*, which, among other things, establishes procedures for fixing shipping rates. Prior to the filing of its petition, Penn–Dixie utilized Thunderbird to transport substantial quantities of raw materials to its plant at Kokomo, Indiana, which were shipped on a "collect" basis, and to transport finished steel products from its plant to third party consignee/customers, which were shipped on a "prepaid" basis.

Thunderbird has not been paid freight charges for its services rendered during the pre–petition period, February · 28, 1980 through April 3, 1980, and in an effort to secure full payment, instituted this adversary proceeding, [Bankruptcy Rules of Procedure, 701 *et seq.*], requesting a variety of declaratory, monetary, and injunctive relief. The total unpaid freight charges are in excess of $100,000.00, of which approximately sixty percent represents freight charges owed on goods shipped from Penn–Dixie as consignor to third party consignees and forty percent represents freight charges owed on goods shipped to Penn–Dixie as consignee. Simultaneously, with its summons and complaint, Thunderbird also sought by order to show cause a preliminary injunction and temporary restraining order for the purpose of maintaining the status quo. Pending a full trial on the merits, a modified temporary restraining order acceptable to both parties was granted.

A combined hearing and trial was held and the issues extensively briefed, both pre and post trial.

Essentially, Thunderbird makes three arguments. As its primary argument, Thunderbird claims that the ICA mandates payment in full to Thunderbird of its statutorily approved freight charges, regardless of the intercession of Penn–Dixie's filing of a Chapter 11 petition. Second, Thunderbird argues that under common law principles, any freight charges collected by Penn–Dixie are held in trust for Thunderbird's benefit. Lastly, Thunderbird contends that under the ICA, it has a statutory lien on freight it delivered to Penn–Dixie as consignee on which freight charges have not been paid. Penn–Dixie, of course, vigorously contests each of these points and seeks restoration of $2,977.16 in freight charges collected by Thunderbird from the Penn–Dixie customer/consignees. Further facts are developed as pertinent.

I

*Interstate Commerce Act*

◼ Thunderbird contends that the ICA commands "that every common carrier must bill and receive the exact amount of freight charges, no more and no less, due to it under its statutorily approved freight rates regardless of any and all extenuating circumstances...." It further takes the position that "the Interstate Commerce Act imposes liability on both consignor and consignee for the full amount of its freight charges and absolutely prohibits Penn–Dixie, after receipt of payment of such freight charges from third party consignees, from including such freight charges in its debtor's estate."

Thunderbird's postulates exaggerate the dogma of the case law. First, in creating the regulatory scheme of the ICA, Congress did not undertake to settle every collection problem, nor did it intend to fashion a sword to insure collection in every instance. *Consolidated Freightways Corp. v. Admiral Corp.*, 442 F.2d 56, 62 (7th Cir. 1971). Thunderbird misinterprets the purpose and policy of this important transportation legislation.

---

1. Title I of the Bankruptcy Reform Act of 1978, Pub.L. 95–958, 92 Stat. 2683, enacted and codified as Title 11 of the United States Code, the "Bankruptcy Code", and all section references may be found therein unless otherwise indicated.

As stated in 1 *Collier on Bankruptcy* (15th Ed.) ¶ 5.37 at 5–158:

> The legislative history of the Interstate Commerce Act, and indeed Congress' concerns with the content of what the Interstate Commerce Act purported to achieve, show plainly that correcting the evil of *discriminatory* transportation practices was the principal objective of the Act. Accordingly, the Interstate Commerce Act embodied a wide–reaching and sweeping scheme to prohibit unjust *discrimination* in the rendition of like services under similar circumstances or unreasonable advantages to those involved in the business of interstate commerce. (Emphasis added)

In other words, the purpose of the ICA is to secure equality of rates to all and to destroy favoritism. The ICA is not necessarily frustrated, as Thunderbird contends, if through the intervention of bankruptcy, a carrier is prevented from collecting full freight charges. As will be demonstrated, this is such a case.

Second, it would be incorrect to state that a consignee/beneficial owner of shipped goods will always be jointly and severally liable for a carrier's freight charges. Though this may appear to be the general rule, *see e. g. Illinois Steel Co. v. Baltimore & Ohio Railroad Co.*, 320 U.S. 508, 64 S.Ct. 322, 88 L.Ed. 259 (1944); *Louisville & Nashville Railroad Co. v. United States*, 267 U.S. 395, 45 S.Ct. 233, 69 L.Ed. 678 (1925); *Pittsburg, Cincinnati, Chicago & St. Louis Railway Co. v. Fink*, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919); and 49 U.S.C. § 10744, it is not without exception. Nothing in the ICA suggests that Congress intended to impose absolute liability upon a consignee for freight charges. *See, Consolidated Freightways Corp. v. Admiral Corp., supra.* In fact, the trend of the cases of the last decade, and especially the latest cases in both the federal and state courts, has been to hold that a carrier will be barred from recovering from a consignee when the ICA's policy against discrimination is not violated, and further, these holdings are not limited to preventing double payment by

the consignee. *See, Checker Van Lines v. Siltek International*, 169 N.J.Super., 102, 404 A.2d 333, 335 (1979) (and see cases cited therein).

The case law further reveals that, when, as here, there is no question as to the amount of the freight charges, and the question is only who is to be responsible for payment, *discrimination is not involved*, and the purpose of the ICA is therefore not frustrated by barring or estopping a carrier from collecting its freight charges from the consignee and making him look solely to the shipper. *Consolidated Freightways Corp. v. Eddy*, 266 Or. 385, 513 P.2d 1161, 1165 (1973). Indeed, Penn–Dixie freely admits its full liability to Thunderbird for the freight charges, and the amount is not in dispute. However (and this is the heart of the dispute), Penn–Dixie asserts that Thunderbird must look solely to it, the shipper, for its compensation and that Thunderbird's attempt to collect directly from the third–party consignees is improper. In determining whether the consignees have liability, expressly or impliedly, the facts of each particular case must be examined. *Lyon Van Lines v. Cole*, 9 Wash.App. 382, 512 P.2d 1108, 1112 (1973).

In the instant case, I have determined that Thunderbird has no recourse against the Penn–Dixie Customers/Consignees. Thunderbird's sole recourse is against Penn–Dixie.

█ The tariffs filed with the Interstate Commerce Commission do not ordinarily prescribe which party to the carriage contract is to pay freight charges. *Illinois Steel Co. v. Baltimore & Ohio Railroad Co., supra.* "Congress left the initial determination of a party's liability for freight charges to express contractual agreement or implication of law." *Consolidated Freightways Corp. v. Admiral Corp., supra* at 62; *Illinois Steel Co., supra.* Subject to the prohibitions against unlawful discrimination, the parties may decide among themselves who shall pay the freight charges, *Illinois Steel Co., id.*, and where the payment of full freight charges may be demanded from one party, the antidiscriminatory policy of the

ICA is satisfied. *Consolidated Freightways Corp. v. Admiral Corp., supra; See also Lyon Van Lines v. Cole, supra, Checker Van Lines v. Siltek International, supra.*

The entire record makes it abundantly clear that Thunderbird looked solely to Penn–Dixie for freight charges. This was the understanding of the parties and this understanding is evident in every facet of their business relationship. Penn–Dixie alone contracted with Thunderbird for its carrier services. Thunderbird billed Penn–Dixie directly for freight charges, after the goods were delivered. Penn–Dixie paid these charges from its general funds. Penn–Dixie billed its customers on a unitary basis (one net amount) and the customers paid this single amount directly to Penn–Dixie, which amount was then deposited into its general accounts. There was no agreement or any request by Thunderbird for segregation of any portion of the funds received from customers, and none took place. Nor were the two billing processes (Thunderbird/Penn–Dixie, Penn–Dixie/Customers) synchronized so as to give Penn–Dixie the appearance of being a mere conduit between carrier and consignee for freight charges. Further, both the bills of lading (which though prepared by Penn–Dixie, were signed by Thunderbird's agents without objection during their entire course of dealing), and Thunderbird's own delivery tickets that accompanies each shipment were marked "prepaid", indicating that Penn–Dixie had paid freight charges or was at least responsible for them in Thunderbird's eyes. *See, Southern Pacific Transportation Co. v. Campbell Soup Co.,* 455 F.2d 1219, 1220 (8th Cir. 1972) (defining "prepaid").

In fact, by every indicia, there was a complete absence of any conduct on the part of Thunderbird at any time that would indicate that Thunderbird was looking to the consignees for payment. Indeed, if there was any such intention, the consignees would probably not have agreed to an arrangement that would have the potential of liability for charges in excess of the invoice price. Penn–Dixie's pricing practices absorbed part of the freight costs in order to make its products price competitive with those of competing sellers situated closer to the purchasers.[2] Further, this sales relationship was fostered by Thunderbird's misleading use of documentation marked "prepaid", the "prepaid" imprimatur on the documentation being a necessary element to Penn–Dixie's and its customer's course of dealing.

The short and the long of the matter is that Thunderbird's arrangement with Penn–Dixie contemplated that only Penn–Dixie would be held liable for freight charges. This accommodation, under the ICA, the parties were free to choose and decide among themselves. No antidiscriminatory policy of the ICA was violated since Penn–Dixie was charged at the full legal rate and since payment for the full freight charges may be demanded from Penn–Dixie. Thunderbird's lack of recourse against the consignees is but a function of its own course of conduct in dealing with Penn–Dixie.

The fact that Penn–Dixie is now in a Chapter 11 reorganization changes nothing. As pointed out earlier, the ICA does not insure collection in every instance. The possibility that under the scheme of bankruptcy reorganization, Penn–Dixie may be able to satisfy its indebtedness to Thunderbird by paying a lesser amount is simply not violative of the ICA's policy and purpose. Surely, any deficiency incurred by Thunderbird because of the bankruptcy law's important and cornerstone policy of equality of distribution, *Sampsell v. Imperial Paper Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941), is not discriminatory in any sense of the word as used in, and comprehended by, the ICA. "The rights and duties

---

**2.** Thunderbird claims that Penn–Dixie is violating Sections 11901–11904 of the ICA, 49 U.S.C. 11901–11904, by its freight absorption policy (i.e.: charging its customers less for freight charges than Penn–Dixie itself must incur as an expense). Penn–Dixie denies that this practice violates the ICA. Either way it would not affect the relationship between the parties here. Thunderbird is not an aggrieved competitor of Penn–Dixie.

created by the Interstate Commerce Act are for the protection of the public against secret rebates and discriminations rather than for the enrichment of the carrier." 13 *C.J.S. Carriers* § 393.

Even under a set of facts where Thunderbird would have recourse against the consignees, its relief would be quite limited. At the time Thunderbird filed its complaint, Penn–Dixie had already received payment from the bulk of its customers for invoices corresponding to Thunderbird's unpaid freight bills. Under the majority rule today, a consignee is not liable to the carrier for payment of freight charges where the shipment was accompanied by a bill of lading marked "prepaid" and the consignee has already paid the consignor. *See, Interstate Motor Freight System, Inc. v. Wright Brokerage Company*, 539 S.W.2d 764 (Mo. App.1976) (and cases cited therein), whose analysis this Court views as controlling on this point.[3] *See also, Farrell Lines Inc. v.*

*Titan Industrial Corp.*, 306 F.Supp. 1348 (S.D.N.Y.1969), *aff'd per curiam*, 419 F.2d 835 (2d Cir. 1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970) (where this circuit applies the same rationale as in *Interstate Motor Freight, Inc.*, albeit in a different context under the ICA).[4]

## II

*Trust*

On the basis of "common law trust principles", Thunderbird argues that it is entitled to payment of all freight charges collected by Penn–Dixie. I suppose that by the designation "common law", Thunderbird intended to shotgun the entire trust field, which includes both express and implied trusts.[5] At an initial stage in the proceedings, Thunderbird in its pre–trial brief diffidently stated that the debtor held the freight charges received from its customers

---

**3.** Moreover, under the analysis in the *Interstate Motor Freight System* case, Penn–Dixie's freight absorption policy, *see* Note 2, *supra*, would not have any affect on this rule. *Id.* at 768. Further, both at trial and in Thunderbird's post–trial memorandum of law, Thunderbird argued that Penn–Dixie's receipt of its unitary billings must be deemed to include full freight charges (Plaintiff's post–trial memorandum at 27–28), in which case, the consignees fully discharged their obligation.

**4.** Thunderbird in its post–trial memorandum misconstrued Penn–Dixie's argument on this point. It is not argued that Thunderbird is not entitled to payment of its freight charges in full measure because it is estopped from collecting freight charges from third party consignees where the bills of lading were marked "prepaid". Conversely, the argument is validly advanced that estoppel takes place where a shipment is delivered under a bill of lading marked "prepaid" *and* the third party consignee has paid the consignor. This latter argument goes to the protection of consignees who in reliance upon the carrier's documentation has already paid once to their detriment, and in good conscience cannot be made to pay again. (These are the so–called "double payment" branch of cases.) Accordingly, and for the reasons explained in *Interstate Motor Freight System, supra*, Thunderbird's line of cases dealing with undercharge situations, or applying those cases by analogy, is inapposite, and do not control here.

**5.** Express and implied trusts are the two major categories of trusts. Express trusts are also denominated as voluntary, direct, declared or conventional trusts. Implied trusts are also called trusts arising by operation of law or involuntary trusts. There are two classes of implied trusts–resulting and constructive trusts. Resulting trusts are also called presumptive trusts. Constructive trusts are also called trusts ex malefico, trusts ex delicto, or trusts in invitum.

This list is not all inclusive and there are further subclassifications. See, 89 C.J.S. Trusts §§ 10–15 at 722–729.

Briefly, an express trust arises from a manifestation of intention to deal with the trust property ("res") in the capacity of a trust. The duty of the court is to enforce that intention. On the other hand, an implied trust, whether resulting or constructive, arises because a court of equity compels one person to deal with the property for the benefit of the other. For instance, a constructive trust is imposed to redress a wrong or prevent unjust enrichment, not upon the intention of the parties. A resulting trust arises in favor of a person who transfers property under circumstances that infer that the transferor did not intend to transfer more than bare legal title and not the beneficial interest. See, I *Scott on Trusts* § 2.1 and V *Scott on Trusts* §§ 404.2, 462.1.

Here it is clear that Thunderbird does not claim a resulting trust. It did not part with property.

on its behalf or "in some form of trust" capacity.

If a trust were shown, Penn–Dixie's right to moneys in question is susceptible of defeasance. See, 4 *Collier on Bankruptcy* (15th Ed.) ¶ 541.13, N.1 at 541–66. However, the grounds in this case for the invocation of any trust relationship are completely lacking. As was observed by Judge Gourly in a bankruptcy case where a trust relationship was similarly claimed:

> Ordinarily every claimant to the assets in the hands of the trustee [or debtor in possession] of the bankrupt estate desires priority and for that reason seeks to establish that his property was acquired under circumstances giving rise to a relationship other than that of an unsecured creditor.

*In re Tate–Jones & Co.*, 85 F.Supp. 971 (W.D.Pa.1949).

Preliminarily, before turning to the substance of the trust issue, a small excursus is necessary. Penn–Dixie raised an irrelevant nondeterminative conflict of law question.

Thunderbird grounds much of its requested relief upon "common law" principles and cites authorities from both the state of Indiana (the state where Penn–Dixie's main steel plant is located and from which Thunderbird carried freight in and out) and New York (the forum state). Penn–Dixie insists that the Court must look to local law, citing *Elliott v. Bumb*, 356 F.2d 749 (9th Cir. 1966), *cert. denied* 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1967) and *Malone v. Gimpel*, 151 F.Supp. 549 (N.D.N.Y.1956), *aff'd* 244 F.2d 954 (2d Cir. 1957), and seems to equate this with the internal law of the forum (i. e., the law of the forum excluding its own conflict of law rules), New York, citing, *In re Faber's Inc.*, 360 F.Supp. 946 (D.Ct.1973); *In re Dexter Buick–GMC Truck Co.*, 2 B.R. 251 (Bkrtcy.D.R.I.1980); and *Jaffke v. Dunham*, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957) as dispositive.

Why Penn–Dixie chose to ignore the forum state's conflict of law rules, or if it did actually apply them and concluded that the forum, New York, would use its own trust law, is not explained. Further though

Penn–Dixie proposed the rule of the case, to play it safe, it supports its argument under Indiana as well as New York law.

In resolving this byway issue, the authorities indicate that one must first determine the form of trust under consideration. If an express trust is to be construed, 1A (pt. 2) *Moores Federal Practice* ¶ .310 at 3141 N. 41, and 4A *Collier on Bankruptcy* (14th Ed.) ¶ 70.07 N. 8 at 88 are helpful guides. If the case concerns an implied trust, *Collier*, id. at ¶ 70.04, N. 31 at 60, and at ¶ 70.70[2], and *In re Tate–Jones, supra* (for constructive trusts) should be consulted. *See also generally, Moores, supra* at ¶ .311, .319, and .325.

Fortunately, this often complex and labyrinthine issue does not need to be resolved in this proceeding. Certain elements are so basic to the establishment of trusts that "[w]hether the common law or state law is applied, the same result will be obtained since there does not appear to be any difference in the rules which will govern" *In re Tate–Jones & Co., supra* at 980 (Federal District Court sitting in Pennsylvania comparing state and federal law on constructive trusts). To put it another way, giving Thunderbird the benefit of the jurisdiction with the most liberal trust formation rules, no trust in their favor would arise in this case.

Often transactions that at first blush appear to establish a trust relationship, on closer view, do not attain that status. One such distinction exists between the concepts of debt and trust. A debt arises when one incurs a mere personal obligation to make payment of a sum of money. This is quite different from a trust, where one takes on a duty to deal as a fiduciary with specific property for the benefit of another.

At times, whether a debt or trust arose may not be too clear. In these cases the intention of the parties must be sought and is determinative. If the formative language, written or oral, provides no clue, resort to circumstances surrounding the transaction in question must be had. In general, when the circumstances are such that the recipient of the funds is entitled to

use them as his own and can commingle them with his own moneys, a debtor–creditor relationship exists, not a trust. *In re Penn Central Transportation Co.*, 328 F.Supp. 1278 (E.D.Pa.1971); 4A *Collier on Bankruptcy* (15th Ed.) ¶ 541.13 at 541–67.

■ Here, by virtue of the foregoing, no express trust was created. There is no evidence of an agreement to reserve a portion of the customers' receipts to pay freight charges, nor did Thunderbird even request such an arrangement. There is also no evidence that Penn–Dixie held the moneys in a separate account, notwithstanding the above. Thunderbird failed to establish the existence of any limitation against Penn–Dixie, with respect to either the receipt of funds from customers or their subsequent disbursement. To be sure, the evidence reveals that Penn–Dixie's general corporate accounts were used at all times for the Thunderbird transactions. This conduct is consistent with that of a debtor–creditor relationship and not with that of a trust relationship. *See generally,* I *Scott on Trusts* § 12 at 103–139.

Whether there are grounds to impress a constructive trust (a form of implied trust), must be examined separately.

A comprehensive definition of a constructive trust is difficult, but basically and briefly:

> A constructive trust arises where a person clothed with some fiduciary character, by fraud or other action upon his part, gains something for himself which, except for his act, he would not have procured and which it is inequitable for him to retain. If one obtains property by such arts, acts, or circumstances of circumvention, imposition, or fraud or by virtue of a confidential relationship and influence, under such circumstances that he ought not, according to the rules of equity and good conscience, hold and enjoy the beneficial interest, the court, in order to achieve complete equity, will declare a trust by construction and convert the offending party into a trustee and order him to hold the same subject to a lien or direct him to execute the trust so

as to protect fully the rights of the defrauded or deceived party. (Citations omitted) Courts of equity declare trusts of this character and recognize equitable liens because of what they deem fraud, either actual or constructive, including acts or omissions in violation of fiduciary obligations. The constructive trust may be one in which the existence of confidential relation and subsequent abuse of the confidence reposed produce a result abhorrent to equity. The burden of proof was upon appellant to prove that its claim is of this character.

*Continental Illinois Nat. Bank & Trust Co. v. Continental Illinois Nat. Bank*, 87 F.2d 934, 936 (7th Cir. 1937). *Compare,* V *Scott on Trusts* § 462; 89 *C.J.S. Trusts* § 139; 76 *Am.Jur.2d Trusts* § 121; 61 *N.Y. Jur. Trusts* § 140; 28 *I.L.E. Trusts* § 71.

■ *A fortiori,* a constructive trust is an equitable remedy and not a trust in the true sense. This Court, as a court of equity, 28 U.S.C. § 1481, *Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230, is free to invoke this remedial device to meet the needs of justice; however, under the facts and circumstances of this case, there is no basis on which to impress a constructive trust. A holding of the United States Supreme Court, dealing with a claimed constructive trust, is instructive and embraces the controlling principle.

> The bankrupt was a debtor which had failed to pay its debt. We know of no principle upon which that failure can be treated as a conversion of property held in trust.
>
> \* \* \* \* \* \*
>
> It would be impossible to state all the circumstances in which equity will fasten a constructive trust upon property in order to frustrate a violation of a fiduciary duty. *See* 3 *Pomeroy, Equity Jurisprudence,* § 1044 *et seq.* But mere failure to pay a debt does not belong in that category.

*McKey v. Paradise*, 299 U.S. 119, 122–123, 57 S.Ct. 124, 125, 81 L.Ed. 75; *See also, Continental Illinois Nat. Bank & Trust Co.,*

*supra* at 936; *Mahon v. Stowers,* 416 U.S. 100, 105, 94 S.Ct. 1626, 1628, 40 L.Ed.2d 79; *Cherno v. Dutch American Mercantile Corporation,* 353 F.2d 147, 154 (2d Cir. 1965).

In the instant case, as in *McKey,* the debtor's sole wrong was the mere failure to pay a debt due. No fraud or unconscionable conduct is involved. Paring the transactions to essentials, Penn–Dixie simply assumed a simple contractual obligation to pay Thunderbird the full posted I.C.C. tariff rates for shipping steel. At the inception of this agreement, Thunderbird opted to extend credit to Penn–Dixie and did not demand prepayment or payment before releasing the shipped goods, both protections permitted under the ICA. Applying hindsight, the largess of credit to Penn–Dixie proved a poor choice given the unanticipated intervening insolvency proceeding. There is now no equitable or other ground upon which Thunderbird can increase its status beyond that of an ordinary, general, unsecured creditor. To impress a constructive trust, there must be at least a wrongdoing greater than the nonpayment of a debt. The highest court of the land has so indicated.

In sum–this Court concludes that there is no basis on which to recognize any trust concept. Thunderbird's cited cases arguing in favor of a trust are inapposite. These cases are discussed briefly.

In *United States National Bank v. Blauner's Affiliated Stores, Inc.,* 75 F.2d 826 (3d Cir. 1935), unlike the instant case, the bankrupt had an agreement to keep, and did keep, a separate account.

In both *In re Woodman,* 186 F. 533 (D.Mass.1910) and *In re John H. Parker Co.,* 268 F. 868 (D.Ohio 1920), the courts clearly proceeded on a resulting trust theory.

*Brown v. Brown,* 135 N.E.2d 614, 235 Ind. 563 (1956), did hold that constructive fraud is a ground for constructive trust and that acts which "secure an unconscionable advantage" or which "injure the public interest" may constitute constructive fraud; however, neither of these two wrongs is present. This Court concluded that the ICA's protective policy purpose was not violated thus there is no injury to the public at large. Further, it is no more an unconscionable advantage for Penn–Dixie to retain its full customer billings, then it was for the bankrupt employer in *McKey v. Paradise, supra* (where no constructive trust was found by the Supreme Court) to retain portions of earned, but withheld, wages which were supposed to be placed in a welfare association (a life, health and accident insurance fund) that the bankrupt maintained for his employees. As the Supreme Court stated, "The fact that the failure to pay . . . was an acute disappointment and was especially regrettable . . . , cannot avail to change the debtor into a trustee . . ." *Id.* 299 U.S. at 123, 57 S.Ct. at 125.

The "inference" drawn in *Harvey Brokerage Company v. Ambassador Hotel Corp.,* 57 F.2d 727 (S.D.N.Y.1932), a case where a trust and not a debtor–creditor was found, cannot be applied under the facts of the instant case.[6]

Thunderbird did not turn over to Penn–Dixie property to be sold. It rendered a

---

**6.** Using general principles akin to those found in the *Restatement of Trusts* and *Restatement of Restitution* (section on constructive trusts), the court stated two axioms.

  1. The technique to the solution of this question seems to be this: When A [the porter] turns over to B [the Hotel] some of his property to be sold or evidence of debts owed to him which he wishes to have collected, the presumed intention of both parties is that B is to keep the funds which are proceeds of the sale or of the collection intact and turn them over in due course to A, and not that B may use them for his own purposes and later pay other moneys over to A.

2. . . . [If] by a long established course of dealing between them, or by the custom of the particular business in which they are jointly participating, B has the right to commingle A's money, when collected, with his own, and use it for his own purposes as would a bank in which A was a depositor and which had collected notes for him, the relation is that of debtor and creditor. *Id.* at 729.

Whereas the application of the first principle may have been appropriate under the facts in *Harvey*; the second principle is more susceptible to application in the instant case, though neither is exactly on point.

service for which it expected compensation. Nor did Thunderbird request Penn–Dixie, expressly or impliedly, to collect money from the consignees. Thunderbird looked to Penn–Dixie from start to end and had no relationship with the consignees other than to deliver freight as designated. Further, if the consignees for any reason did not pay Penn–Dixie, Thunderbird still viewed Penn–Dixie as fully liable.

Lastly, Thunderbird argues for a trust based upon a comment made in the legislative history accompanying Section 541 of the Bankruptcy Code (property of the estate), which states:

Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed. This section and proposed 11 U.S.C. 545 also will not affect various statutory provisions that give a creditor of the debtor a lien that is valid outside as well as inside bankruptcy or that creates a trust fund for the benefit of a creditor of the debtor. *See, Packers and Stockyards Act* § 206, 7 U.S.C. 196.

H.R.Rep.No. 595, 95th Cong., 1st Sess. 367–8 (1977); S.Rep.No. 989, 95th Cong., 2d Sess. 82–83 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. Any application of the example therein by analogy to the instant case is misplaced.

It would be unreasonable to believe that by way of one example, Congress intended to restate the law of constructive trusts. Every case must be judged on its own particular facts. Second, insurance is special. By definition, "Insurance is an arrangement for transferring and distributing risk" R. Keeton, *Insurance Law* § 1.2(a) at 2 (West 1971). An ordinary contractual obligation, consisting of a debt, such as here, does not contemplate this arrangement. Third, the linchpin for constructive trust in the example may very well be mistake, which in equity can give rise to a constructive trust. It seems to me that in the ordinary course, health/medical insurance agreements provide that payments, for expenses that are covered, will be made directly to the "healer", and that direct payment to the insured is only made in those instances where the insured presents proof of prior payment by himself. In sum, the legislative history comment is inappropriate to the applicable facts and principles involved in this case. (The commentary in the legislative history concerning statutory liens will be dealt with in the next section of this opinion.)

A discussion of trusts can almost never be exhaustive and although both parties have well developed arguments on tracing, this Court need not go further. "[I]f it cannot first be shown that a trust has been created, there is no necessity for inquiry as to whether the property can be identified or traced." 4 *Collier on Bankruptcy* ¶ 541.13 at 541–67.

## III

### *Carrier's Lien Under the ICA*

Thunderbird claims to have a statutory lien on freight delivered to Penn–Dixie as consignee by virtue of Section 25 of the Federal Uniform Bills of Lading Act, 49 U.S.C. § 105. This provision, in pertinent part, provides:

If an order bill is issued the carrier shall have a lien on the goods therein mentioned for all charges on these goods for freight . . .

An "order bill" is defined as:

A bill in which it is stated that the goods are consigned or destined to the order of any person named in such bill . . .

49 U.S.C. § 83.

The bills of lading at issue are not designated "to the order of" Penn–Dixie. In fact, they are "straight bills". A straight bill is defined as:

A bill in which is stated that the goods are consigned or destined to a specified person . . .

49 U.S.C. § 82.

 Each bill of lading clearly states that the goods are "consigned to Penn–Dixie Steel Corp." and are not marked "to the order of Penn–Dixie Steel Corp." Thus, Thunderbird has no statutory lien under 49 U.S.C. § 105 and none is provided for straight bills of lading.

It should be further noted that even if Thunderbird had a valid carrier's lien, it would still have been faced with Section 362 of the Bankruptcy Code (automatic stay); an insurmountable tracing problem, and finally, the possibility of a possessory requirement (see 13 *Am.Jur.2d Carriers* § 503).

## IV

*Property of the Estate–Epilogue*

The entering of an order for relief under the Bankruptcy Code creates an estate consisting of "all legal or equitable interests of the debtor in property as of the commencement of the case. Section 541(a)(1). More specifically, "[t]he property accruing to the estate under Section 541(a)(1) includes all rights of action the debtor may have arising from contract [including] . . . a right of action . . . for compensation due on a contract. . . ." 4 *Collier on Bankruptcy* (15th Ed.) ¶ 541.10(5) at 541–62.

Penn–Dixie and its customers entered into contracts for the sale of steel products by the former to the latter. Upon performance by Penn–Dixie of its contractual obligation to its customers (receipt by Penn–Dixie customers of the steel products they ordered) the customers incurred an obligation to pay Penn–Dixie, and as a result, an account receivable in favor of Penn–Dixie arose. The definition of property of the estate encompasses this debt. If a customer did not pay their account payable in accordance with the contractual arrangement, Penn–Dixie would have the right to bring an action for the compensation due under the contract. Further, moneys collected from various customers of Penn–Dixie that were attributable to the accounts receivable owing to Penn–Dixie are "proceeds" from property of the estate, and, thus, are likewise property of the estate.

Earlier, it was demonstrated that no superior right or claim, either under the ICA or trust law, to this property of the estate exists in favor of Thunderbird. Therefore the $2,976.16 collected from Penn–Dixie's customers by Thunderbird in mistake of its legal rights shall be accounted for and returned to Penn–Dixie, or on consent of the parties be credited against any future distribution on Thunderbird's claim pursuant to a plan of reorganization. This Court has concluded that Thunderbird is an ordinary, general, unsecured creditor of Penn–Dixie, and as such, its claim must be pursued in the normal course of the bankruptcy proceeding.

Without prejudice to the rights of Thunderbird to file a claim in these proceedings for the unpaid freight charges, Thunderbird is enjoined from further collecting, seeking to collect, receiving, depositing, or otherwise taking possession of or control over funds from Penn–Dixie's customers representing freight charges attributable to the unpaid bills of lading in this proceeding.

So Ordered.