**In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.**

**LTV STEEL COMPANY, INC., and Republic Drainage Products Company, Plaintiffs,**

**v.**

**DAVID GRAHAM CO., Defendant.**

Bankruptcy Nos. 86 B 11270 (BRL) through 86 B 11334 (BRL). Adv. No. 86 5802A (BRL).

United States Bankruptcy Court, S.D. New York.

Oct. 15, 1987.

Levin & Weintraub & Crames, New York City (Edmund M. Emrich, of counsel), for debtors.

LTV Corporation, Cleveland, Ohio (Kay Woods, of counsel), Augello, Pezold & Hirschmann, P.C., Huntington, N.Y. (George Carl Pezold, of counsel), for David Graham Co.

## DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Chief Judge.

### I. Introduction

On July 17, 1986 (the "Filing Date") The LTV Corporation and approximately sixty-six (66) of its affiliated companies, including LTV Steel Company, Inc. ("Steel") and Republic Drainage Products Company ("Drainage") (collectively the "Debtors") filed petitions for reorganization, under Chapter 11 of Title 11 of the United States Code (the "Code"). The Debtors continue in the management of their businesses and property as debtors in possession under §§ 1107 and 1108 of the Code.

Soon after the Filing Date, in a departure from previous practice and as a result of the Chapter 11 filing, David Graham Company ("Graham"), a freight carrier, sought to collect unpaid pre-petition freight charges for shipments made to the Debtors' consignees. Graham sent freight bills directly to consignees for previously delivered "prepaid" shipments. These consignees included Williams Construction Company, Inc. ("Williams") and IA Construction Corporation ("IA").

Upon the Debtors' application, this Court entered an order to show cause ("OSC") with a temporary restraining order ("TRO") enjoining Graham from taking or continuing any action to proceed against or collect any monies from Williams and/or IA and/or other customers of the Debtors. The Debtors simultaneously filed a complaint pursuant to Rule 7003 of the Fed.R. Bankr.P., seeking *inter alia:* (1) a determination that § 362 of the Code, and this Court's restraining order,[1] both stay Graham from continuing its actions against the Debtors' consignees, and a contempt finding against Graham on account of those actions to date; (2) a determination that pursuant to § 542 of the Code Graham is in possession of estate property, to the extent that it has collected money from any of the Debtors' customers as payment for prepaid freight charges, incurred prior to the Filing Date; (3) an accounting of all monies collected by Graham and an order compelling turnover of those funds to the Debtors; and (4) damages, including attorneys' fees, costs and disbursements.

Counsel for the parties appeared before this court and, pursuant to Rule 65(a)(2) of the Fed.R.Civ.P. as made applicable here by Rule 7065 of the Fed.R.Bankr.P., agreed to combine the hearing on the application for the TRO with the trial on the complaint. The parties submitted a joint stipulation of facts and agreed that there are no facts in dispute material to the outcome of this proceeding. In accordance with Rule 56 of the Fed.R.Civ.P., as made applicable by Rule 7056 of the Fed.R.Bankr.P., the hearing was treated as a motion for summary judgment.

### II. Statement of Facts

The LTV Corporation is primarily engaged in the steel, aerospace/defense and energy industries. Steel is a component of the steel producing group of subsidiaries of the LTV Corporation. The steel group, a fully integrated steel producer, is the second largest steel operation in the United States. It is the largest producer of high quality steel bar products, and of hot and cold rolled sheets of steel for the automobile and consumer durable goods markets. Drainage, a wholly owned subsidiary of Steel, primarily processes and sells products made by Steel's hot-dipped galvanizing line.

Graham is a motor common carrier, licensed by the Interstate Commerce Commission ("ICC"), engaged in the business of moving freight throughout the United States.

Both prior to and subsequent to the Filing Date, Graham on a regular and routine basis, provided shipping services to the Debtors. Stipulation of facts ("Stip.") at paragraph 5. From 1985 through the Filing Date Graham was the primary motor

---

1. This Court supplemented the statutory protections provided by the automatic stay provisions of § 362, by signing a restraining order dated July 17, 1986, that further stayed actions against LTV Steel and/or Drainage and their property.

freight carrier for the Debtors' outbound shipments transported from Harrisburg, Pennsylvania. Stip. at paragraph 7. Before the Filing Date, Graham transported shipments from the Debtors' Harrisburg facility to Williams and IA, two of the Debtors' customers. Stip. at paragraph 13. The parties have opted to focus on these two customers to the exclusion of others.

These shipments were evidenced by Uniform Bills of Lading marked "prepaid". Stip. at paragraph 13. This notation is recognized in the trade as signifying that freight charges will be paid by the consignor. The Bills of Lading were prepared by the Debtors, signed by Graham's drivers and billed directly to the Debtors. Stip. at paragraphs 9–11.

It was the Debtors' practice to bill its customers, including Williams and IA, on a unitary basis (one net amount for delivered materials inclusive of freight) and deposit the customers' payments in a general account. Stip. at paragraph 14. The Debtors paid the freight charges directly to Graham from that general account. *Id.* On occasion the Debtors even absorbed part of the customers' freight cost in order to be competitive with other steel producers whose proximity to their customers enabled them to offer their steel with a lower freight charge. *Id.* This practice, known as "freight equalization," is common in the steel industry. *Id.*

The ICC regulations allow a carrier 15 days during which it may extend credit. 49 C.F.R. § 1320.2(c) (1981). However, for a period of at least six months before the Filing Date, the Debtors paid invoices they received from Graham approximately thirty (30) days after receipt of those invoices. Stip. at paragraph 22. Graham has continued to extend such credit to the Debtors after the Filing Date. Stip. at paragraph 21.

When Graham billed the Debtors' consignees for outstanding "prepaid" freight charges, some consignees refused to pay inasmuch as they had already paid the Debtors for both materials *and* freight. Stip. at paragraph 16. Others who had not already paid, sent checks to the Debtors or

Graham which were payable jointly to the Debtors and Graham. *Id.* Williams and IA were among the latter group, each issuing checks to cover the unpaid freight costs, jointly payable to Steel and Graham. Stip. at paragraph 18. The Debtors received such a check from Williams, but never cashed it. *Id.* Graham received such a check from IA, and cashed the check without the Debtors' endorsement. *Id.*

To date, Graham has acknowledged receiving payments on unpaid, pre-petition, "prepaid" freight charges in the amount of $7,379.10 from various consignees. Stip. at paragraph 19. In addition, due to confusion created by Graham as to who should receive the payments for freight charges, other customers of the Debtors have withheld in excess of $8,400 from payment of the Debtors' invoices. Stip. at paragraph 20. Debtors allege that the total amount of money withheld by its customers due to the actions of Graham or other freight carriers exceeds $600,000.

## III. Issue

This proceeding raises the following two issues: first, whether a common carrier may agree to look exclusively to the consignor for payment of all freight charges; and second, whether such an agreement exists under the instant set of facts.

## IV. Discussion

### A. Jurisdiction

Graham first raised the issue, as to whether this Court has jurisdiction to adjudicate this matter, at the hearing. Transcript ("Tr.") at 25–26.

The instant controversy involves an alleged violation of the automatic stay imposed by § 362 of the Code, and a request for turnover of estate property pursuant to § 542. By their very nature these matters are integral to the administration of the Debtors' estate and are explicitly recognized as core matters. 28 U.S.C. §§ 157(b)(1), (b)(2)(A), (E) and (O). Accordingly, inasmuch as this is a core proceed-

ing, this Court has jurisdiction to hear and rule on the issues raised in the complaint.[2]

## B. The Interstate Commerce Act and the Uniform Bill of Lading

The instant controversy centers around a dispute in interpreting the limitations imposed by both the terms of the Uniform Bill of Lading [3] and the Interstate Commerce Act ("ICA") [4], upon the allocation of liability for freight charges.

A bill of lading serves three distinct functions: "First a receipt for the goods; second, a contract for their carriage; and, third, documentary evidence of title to the goods." *In re Bills of Lading*, 52 I.C.C. 671, 681 (1919). Pursuant to Congressional authority, the ICC has prescribed a uniform bill of lading ("UBOL") to be used in all domestic interstate freight shipments. *Southern Pac. Transp. Co. v. Commercial Metals*, 456 U.S. 336, 342, 102 S.Ct. 1815, 1820, 72 L.Ed.2d 114 (1982) (citing *In re Bills of Lading*, 52 I.C.C. 671 (1919), *modified*, 64 I.C.C. 357 (1921), *further modified*, 66 I.C.C. 63 (1922)).

The UBOL was created in order to promote uniformity and prevent discrimination. *Illinois Steel Co. v. Baltimore & O.R.R.*, 320 U.S. 508, 510, 64 S.Ct. 322, 323, 88 L.Ed. 259 (1943) (citing *In re Bills of Lading*, 52 I.C.C. at 676–77, 678, 64 I.C.C. at 363, 364). More specifically, Congress sought to curb "discriminatory handling of rate collection and credit practices by requiring prompt and uniform collection of full tariff rates and charges." *Consolidated Freightways Corp. of Del. v. Admiral Corp.*, 442 F.2d 56, 61 (7th Cir.1971); *Farrell Lines Inc. v. Titan Industrial Corp.*, 306 F.Supp. 1348, 1349 (S.D.N.Y.1969), aff'd 419 F.2d 835 (2d Cir.1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970).[5] However, as discussed more fully below, the carrier's statutory obligation to collect full freight charges was not intended to impose absolute liability for those charges on a consignee, but instead to prevent price discrimination by the carrier. *Consolidated Freightways Corp.*, 442 F.2d at 61; *Southern Pacific Transportation Co. v. Campbell Soup Co.*, 455 F.2d 1219, 1222 (8th Cir.1972); *Roll Form Products, Inc. v. All*

---

**2.** Although not controlling on this matter which predated the August 1, 1987 effective date of the amended Federal Rules of Bankruptcy Procedure, this Court notes the language added by those amendments to Fed.R.Bankr.P. 7008(a): "In an adversary proceeding before a bankruptcy judge, the complaint, counterclaim, cross-claim, or third-party complaint shall contain a statement that the proceeding is core or non-core and, if non-core, that the pleader does or does not consent to entry of final orders or judgments by the bankruptcy judge." The complaint contained a jurisdictional statement.

The language added by those amendments to Fed.R.Bankr.P. 7012(b) states: "A responsive pleading shall admit or deny an allegation that the proceeding is core or non-core. If the response is that the proceeding is non-core, it shall include a statement that the party does or does not consent to entry of final orders or judgment by the bankruptcy judge. In non-core proceedings final orders and judgments shall not be entered on the bankruptcy judge's order except with the express consent of the parties." The answer did not specifically call jurisdiction into issue.

**3.** Section 7 of the UBOL states in relevant part: "The owner or consignee shall pay the freight and average, if any, and all other lawful charges accruing on said property; but, except in those

instances where it may lawfully be authorized to do so, no carrier shall deliver or relinquish possession at destination of the property covered by this bill of lading until all tariff rates and charges thereon have been paid. The consignor shall be liable for the freight and all other lawful charges, except that if the consignor stipulates by signature in the space provided for that purpose on the face of this bill of lading that the carrier shall not make delivery without requiring payment of such charges and the carrier contrary to such stipulation shall make delivery without receiving such payment, the consignor (except as herein after provided) shall not be liable for such charges...."

**4.** *See* 49 U.S.C. § 10701 *et seq.*

**5.** *See also Allied Chemical Corp. v. Burlington Northern, Inc.*, 353 I.C.C. 499, 501 (1977) ("Numerous judicial decisions have noted that the act is intended to secure uniformity of treatment to all, suppress unjust discrimination and undue preference, and prevent special and secret agreements with respect to rates for interstate transportation. To that end of [sic] the act requires that rates be: (a) established in a manner calculated to give them publicity, (b) inflexible while in force, and (c) unalterable save in the mode prescribed.").

State Trucking Co. (In re Roll Form Products, Inc.), 662 F.2d 150, 154 (2d Cir. 1981); Thunderbird Motor Freight Lines, Inc. v. Penn–Dixie Steel Corp. (In re Penn–Dixie Steel Corp.), 6 B.R. 817, 820 (Bankr.S.D.N.Y.1980), aff'd, 10 B.R. 878 (S.D.N.Y.1981).

## C. The law in this Jurisdiction

The issues raised in the instant proceeding were previously addressed and resolved not only by this Court but by the Second Circuit Court of Appeals. See In re Roll Form Products, Inc., 662 F.2d 150 (2d Cir. 1981); In re Penn–Dixie Steel Corp., 6 B.R. 817 (Bankr.S.D.N.Y.1980), aff'd, 10 B.R. 878 (S.D.N.Y.1981). Both the Roll Form and the Penn–Dixie decisions arose out of fact patterns virtually identical to those again before the Court.

The ultimate holding in both cases was that a common carrier may agree to look exclusively to a consignor for payment of all freight charges. Nonetheless, dissatisfied with existing precedent, Graham is asking this Court to either overrule the law as it stands in this Circuit or to distinguish the facts in this case from the almost identical essential facts found in Roll Form and Penn–Dixie.

In Roll Form, subsequent to the consignor-debtor's filing of its chapter 11 petition, the carrier proceeded to recover freight charges directly from the Debtor's consignees. Roll Form, 662 F.2d at 152. This contravened an alleged contract[6] pursuant to which the consignor-debtor and the carrier agreed that the consignees were to be exclusively liable to the consignor-debtor for all freight charges, and that the carrier was bound to look exclusively to the consignor-debtor for payment. Id. at 151–52. The carrier's actions resulted in those payments being withheld from the consignor-debtor's estate. Id. The consignor-debtor therefore sought a court order en-

joining this practice by the carrier. Id. at 152. The Bankruptcy Court denied the requested relief. Id. at 152–53.

The Second Circuit reversed the Bankruptcy Court's decision. In doing so the Second Circuit held that a consignor, unaffected by § 10744 of the ICA, could agree to be exclusively liable to a carrier for freight charges where the parties to the action contracted for the customer-consignee to pay freight charges exclusively to the consignor-debtor, and for the carrier to look solely to the consignor-debtor for payment. Roll Form, 662 F.2d at 154.

In Penn–Dixie, the carrier was owed freight charges for pre-petition services, and it commenced an adversary proceeding against the consignor-debtor seeking to secure full payment of those charges. 6 B.R. at 819. The carrier argued that the ICA precluded those freight charges from qualifying as property of the estate. Id.

In the Penn–Dixie decision, cited with approval by the Second Circuit in Roll Form, 662 F.2d at 154, this Court listed a number of factors (discussed below) which it found sufficient to establish an arrangement, placing exclusive liability for freight charges upon the consignor-debtor. 6 B.R. at 821. Having found such an arrangement, this Court held that the carrier could only look to the consignor-debtor for its compensation, and that the carrier was precluded from collecting directly from the consignees. Id. at 820. In its decision affirming this opinion, the District Court stated:

> Since the arrangements between the parties as found by the Bankruptcy Judge were that Thunderbird [the carrier] would look solely to the shipper [consignor] for compensation of freight charges, any attempt by Thunderbird to collect directly from the Penn Dixie consignees is improper.... Thunderbird has only a general creditor's right against the reor-

---

**6.** The Second Circuit noted that "Roll Form's entire action was premised upon the assumption that, by contract, the freight charges being pursued by defendants were exclusively owed to Roll Form's estate and were thus protected by the automatic stay provisions of the Bankruptcy Act...." Id. at 152. "the question of whether

the prepayment arrangement had been established informally for the convenience of the parties or by definitive contract" had never been reached. Id. at 155. The matter was therefore remanded to the Bankruptcy Court for a determination of this issue. Id.

ganization estate therefor and must account to Penn Dixie [the consignor-debtor] for the amount collected for account of Penn Dixie.

*Penn–Dixie,* 10 B.R. at 879

### D. Graham's Arguments

Graham however argues that both *Roll Form* and *Penn–Dixie* were incorrectly decided. Specifically Graham alleges that: 1) the UBOL is a statutorily prescribed form of contract which the parties may not agree to alter and that the explicit language of section 7 of the terms and conditions of the UBOL afford the carrier an independent contractual right of action against the consignee;[7]

2) a carrier has an independent, common-law right to collect charges from consignees; and

3) even if the law does recognize such liability allocating agreements, the factors outlined in *Penn–Dixie* are insufficient to establish a contract between the parties to this proceeding. These allegations are addressed below seriatim.

**(1) Parties to a shipping contract governed by the ICA and the UBOL may agree that the consignor will be exclusively liable for payment of freight charges.**

■ In *Penn–Dixie* this Court concluded that a consignor and a carrier can allocate exclusive liability for freight charges on the consignor.

In that opinion this Court stated:

[I]t would be incorrect to state that a consignee/beneficial owner of shipped goods will always be jointly and severally liable for a carrier's freight charges. Though this may appear to be the general rule, *see e.g. Ill. Steel Co. v. Baltimore & Ohio Railroad Co.,* 320 U.S. 508, 64 S.Ct. 322, 88 L.Ed, 259 (1944); *Louisville & Nashville Railroad Co. v. United States,* 267 U.S. 395, 45 S.Ct. 233, 69 L.Ed. 678 (1925); *Pittsburg, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink,* 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919); and 49 U.S.C. § 10744, it is

not without exception. Nothing in the ICA suggests that Congress intended to impose absolute liability upon a consignee for freight charges. *See Consolidated Freightways Corp. v. Admiral Corp., supra.* In fact, the trend of the cases of the last decade, and especially the latest cases in both the federal and state courts, has been to hold that a carrier will be barred from recovering from a consignee when the ICA's policy against discrimination is not violated, and further, these holdings are not limited to preventing double payment by the consignee. *See Checker Van Lines v. Siltek International,* 169 N.J.Super. 102, 404 A.2d 333, 335 (1979) (and see cases cited therein).

*Penn–Dixie,* 6 B.R. at 820.

The Seventh Circuit in *Consolidated Freightways Corp. v. Admiral Corp.,* cited with approval in *Penn–Dixie,* explicitly held: "We discern nothing in the language or policies of Section 223 [ (subsequently renumbered without substantive change) ] to suggest that Congress intended to impose absolute liability upon a consignee for freight charges." 442 F.2d 56, 61 (7th Cir. 1971).

Graham however contends that *Roll Form, Penn–Dixie* and *Consolidated Freightways,* in upholding liability allocating agreements, have manifested a "careless and gratuitous expansion" of earlier case law embodied in *Illinois Steel Co. v. Baltimore & O.R.R. Co.,* 320 U.S. 508, 64 S.Ct. 322, 88 L.Ed. 259 (1944). Graham argues that the precedent in this Circuit and the Seventh Circuit failed to apply the correct standard for liability allocating agreements. The *Illinois Steel* case, according to Graham, sets forth the correct standard. In that opinion the Supreme Court stated:

being in interstate commerce, the rail freight rates are those stated in the tariffs filed with the Interstate Commerce Commission. They cannot be lawfully released by the carrier or altered by others who have assumed the duty to pay

7. Section 7 is quoted in relevant part in footnote 3.

them. [ (Citations omitted) ]. The tariffs do not prescribe who is to pay the freight charges, but subject to the prohibition against unlawful discrimination and the limitations imposed by the uniform bill of lading, the parties to the shipment, as between themselves are free to stipulate who shall pay them. *See Louisville & Nashville R.R. Co. v. Central Iron Co.,* 265 U.S. 59, 65–67 [44 S.Ct. 441, 442, 68 L.Ed. 900 (1924) ].

320 U.S. at 511–12, 64 S.Ct. at 324.

Accordingly, any liability allocating agreement arising in the context of an interstate commerce shipping agreement: (a) cannot unlawfully discriminate; and (b) must fall within the limitations of the uniform bill of lading.

While Graham would argue otherwise, the cases criticized by Graham recognize these as the proper criteria. The parties only differ as to whether these criteria are satisfied by the underlying facts.

**(a) An arrangement providing that the consignor will be the carrier's exclusive recourse for payment is not unlawfully discriminatory within the contemplation of the ICA and the UBOL.**

In *Roll Form* the Second Circuit commenced its analysis by looking to the governing language of § 10744 of the ICA. *Roll Form,* 662 F.2d at 153. The Court recognized that as a general rule that section renders "the consignee ... *prima facie* liable for the payment of the freight charges when he accepts the goods from the carrier." *Id.* (quoting *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. v. Fink,* 250 U.S. 577, 581, 40 S.Ct. 27, 63 L.Ed. 1151 (1919)). The *Roll Form* Court however then continued its analysis by looking to the policy behind § 10744, and accordingly it concluded:

The principal purpose of section 10744 as well as the entire Interstate Commerce Act unquestionably was to eliminate all forms of rate discrimination on interstate shipments. *Id.; Southern Pacific Transportation Co. v. Campbell Soup Co.,* 455 F.2d 1219, 1220 (8th Cir.1972). The Act, in our view, was not intended to "fashion a sword" to insure collection by

carriers of freight charges. Nor do we think the Act was intended to impose an absolute liability upon consignees for freight charges. Its sole purpose was "to secure equality of rates to all and to destroy favoritism." *In re Penn–Dixie Steel Corp.,* 6 Bankr. 817, 820 (S.D.N.Y. 1980) (Bankruptcy Court), *aff'd* 10 Bankr. 878 (S.D.N.Y.1981). Accordingly, in the absence of discriminatory practices, we agree with the Seventh Circuit that "Congress left the initial determination of a party's liability for freight charges to express contractual agreement or implication of law." *Consolidated Freightways Corp. v. Admiral Corp.,* 442 F.2d 56, 62 (7th Cir.1971). *Id.* at 154; *see also Louisville & N.R.R. Co. v. Central Iron & C. Co.,* 265 U.S. 59, 66, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1923) ("The tariff did not provide when or by whom the payment should be made. As to these matters carrier and shipper were left free to contract, subject to the rule which prohibits discrimination [footnote omitted].").

It is only "where parties fail to agree, or where discriminatory practices are present, [that] the Interstate Commerce Act will bind the consignee to pay freight charges to the carrier on goods he accepts, this obligation being independent of the consignor's own obligations." *Roll Form* 662 F.2d at 154. Accordingly, as noted above, the *Roll Form* Court recognized the parties' right to consensually allocate liability for freight charges exclusively upon the consignor-debtor.

Graham however fails to recognize that allocating liability exclusively upon the consignor-debtor, does not undermine the anti-discrimination policy of the ICA. Graham alleges that if a carrier were permitted to agree to look to one consignor for payment of charges in one shipping contract, and then permitted to reserve the right to collect from either the consignor or the consignee in another shipping contract, this would rise to the level of unlawful discrimination within the contemplation of both the ICA and case law. This conclusion is simply wrong.

Indeed, to the contrary, the UBOL explicitly *allows* for similar disparate agreements. As noted, Section 7 of the UBOL provides in relevant part that:

"The Consignor shall be liable for the freight and all other lawful charges, except that if the consignor stipulates, by signature, in the space provided for that purpose on the face of this bill of lading that the carrier shall not make delivery without requiring payment of such charges and the carrier, contrary to such stipulation, shall make delivery without requiring such payment, the consignor ... shall not be liable for such charges...."

In other words, pursuant to this non-recourse provision, "if the non-recourse clause is signed by the consignor and no provision is made for prepayment of freight, delivery of the shipment to the consignee relieves the consignor of liability ... and acceptance of the delivery establishes the liability of the consignee to pay all freight charges [(citations omitted)]." *Illinois Steel Co.*, 320 U.S. at 513, 64 S.Ct. at 325; *see also South Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 346, 102 S.Ct. 1815, 1822, 72 L.Ed.2d 114 (1981).

The instant facts present a variation on this permissible allocation of liability. However, rather than imposing exclusive liability upon the consignee, here the Debtors contend that they as consignors, are exclusively liable to Graham the carrier, pursuant to their established arrangements. Permitting such an allocation of liability is no more unlawfully discriminatory than the effect of the non-recourse provision contained in the UBOL. As the Seventh Circuit Court of Appeals stated in *Consolidated Freightways Corp. of Del. v. Admiral Corp.*:

So long as payment of the full tariff charges may be demanded from some party, the antidiscrimination policy of the Section is satisfied. Congress did not undertake to settle all issues of collection with the enactment of Section 223 [ (subsequently renumbered without substan-

tive change) ]. Nor did Congress intend to fashion a sword to insure collection in every instance and a shield to insulate the carrier from the legal consequences of otherwise negligent or inequitable conduct.

442 F.2d 56, 62 (7th Cir.1971).[8]

This Court reached the same conclusion in the *Penn–Dixie* opinion in the following language: "the purpose of the ICA is to secure equality of rates to all and to destroy favoritism. The ICA is not necessarily frustrated ... if through the intervention of bankruptcy, a carrier is prevented from collecting full freight charges." 6 B.R. at 820.

■ The ICA is not a carrier's relief act. This Court notes once again the following statement: "[t]he rights and duties created by the Interstate Commerce Act are for the protection of the public against secret rebates and discriminations rather than for the enrichment of the carrier." *Id.* at 821–22 (*quoting* 13 C.J.S. Carriers § 393); *see also Allied Chemical Corp. v. Burlington Northern, Inc.*, 353 I.C.C. 499, 502 (1977). Neither of these concerns are lurking in the facts now before me. Instead, the instant proceeding involves an attempt by Graham to wrongfully enrich itself by utilizing the ICA to circumvent the orderly asset distribution scheme mandated by the Bankruptcy Code. Accordingly, this Court concludes that recognition of the Debtors' exclusive liability to Graham here does not constitute discrimination within the contemplation of the ICA.

**(b) An arrangement providing for the consignor to be the carrier's exclusive recourse for payment of freight charges does not abrogate any limitations imposed by the UBOL.**

Graham argues that Section 7 of the UBOL imposes a limitation upon the parties' right to allocate liability to the consignor. Indeed, Graham argues that the UBOL establishes a consignee's absolute liability to pay freight charges.

The relevant text of Section 7 states:

---

8. *See also Farrell Lines Inc. v. Titan Industrial Corp.*, 306 F.Supp. at 1349 ("As long as someone is liable for the full amount of the freight, so

that there is no overcharge or undercharge, the public interest is protected and the statutes are satisfied [footnote omitted].").

"The owner or *consignee* shall pay the freight and average, if any, and all other lawful charges accruing on said property, but, except in those instances where it may lawfully be authorized to do so, no carrier shall deliver or relinquish possession at destination of the property covered by this bill of lading until all tariff rates and charges thereon have been paid [(emphasis added)]...."

Applying the law as stated in *Illinois Steel Co.*, 320 U.S. 508, 64 S.Ct. 322 and discussed above, to the quoted language of section 7, Graham concludes that any agreement affixing exclusive liability for freight charges upon the consignor is precluded by the terms of the UBOL. Therefore, Graham asserts that it has an independent right of action against the consignees under Section 7.

Graham's mechanical reading of *Illinois Steel* and Section 7 is incorrect. The provision in the bill of lading that the "owner or *consignee* shall pay [emphasis added]" the shipping charges does not impose the *absolute* liability on the consignee suggested by Graham.[9] In addressing this issue, the Court in *C.F. Arrowhead Services, Inc. v. Amcec Corp.*, stated:

"Resolution of this case is found in the first sentence of section 7. The first part of that sentence, which is the only part CF [(the carrier)] quotes, makes the consignee liable for the freight charges; that is, the charges that are due at the time of delivery. As the rest of the sentence makes clear, however, that liability is not absolute. The carrier, unless lawfully authorized to do so (an exception not involved here), must not relinquish possession of the goods being carried until the freight charges have been paid. The obvious meaning of the sentence as a whole is that the consignee must pay the charges if the carrier so demands but the carrier must make that demand before giving up the goods. So

read, the sentence makes a very practical (and traditional) compromise: the carrier can use its possession of the goods to ensure payment and the consignee can refuse delivery until it is satisfied that the proper party is paying the freight charges. Here, by relinquishing the goods without demanding payment from AMCEC [(the consignee)], CF [(the carrier)] also relinquished its right to recover the freight charges due at that time from AMCEC."

614 F.Supp. 1384, 1386 (N.D.Ill.1985)

Having already determined that unlawful discrimination is not involved herein and that § 7 does not impose the limitation alleged by Graham, this Court concludes that the instant parties were permitted to allocate liability exclusively upon the Debtors without contravening either the terms or policies underlying the ICA or the UBOL.

**(2) Although there is an independent *common law* right to collect freight charges from a consignee, nothing precludes the parties from contractually altering that liability.**

■ Graham's next argument is that the Second Circuit in *Roll Form* ignored the fact that a carrier's right to proceed against a consignee existed at common law. The ICA, Graham notes, preserves common law remedies. *See* 49 U.S.C. § 10103.[10] Therefore, Graham concludes that even absent the applicability of the ICA's anti-discrimination policy, it has an independent common law remedy entitling it to collect charges from the consignees, where the Debtor has not paid those charges.

In support of this argument Graham cites *C.F. Arrowhead Services, Inc.*, 614 F.Supp. 1384. The Court in that case stated that although it is of "somewhat questionable lineage" the common law rule is that "acceptance of delivery makes a consignee liable for all freight charges, with-

---

9. In fact, under one reading of this Section, as long as *either* the shipper *or* the consignee is liable, the section is satisfied. Under this reading, the shipper (i.e. the consignor) in the instant matter is liable, therefore the requirements of Section 7 are satisfied.

10. Section 10103 states: "Except as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies existing under another law or at common law."

out regard to when payment is demanded." *Id.* at 1387–88. Graham therefore argues that a carrier has the independent common law right, to collect from a consignee on a "pre-paid" shipment, where the consignor fails to pay.

This Court notes however that nothing in that opinion, or any other authority cited by Graham addressing common law rights, precludes the parties to a shipping contract from agreeing to affix this common law liability exclusively upon the consignor. Accordingly, the common law rights Graham may have are limited by any liability allocating arrangement, relating to freight charges, entered into by the parties. The existence of such an arrangement in the instant case is discussed immediately below.

**(3) The instant facts establish the existence of a credit agreement pursuant to which Graham agreed to pursue compensation solely from the Debtors.**

■ A bill of lading serves as a contract as well as a receipt, therefore its provisions are to be reviewed in order to ascertain the agreement of the parties it binds. *Louisville & Nashville R.R. Co.*, 265 U.S. at 67, 44 S.Ct. at 442; *In re Bills of Lading*, 52 I.C.C. at 681. Since the instant bills of lading and tariffs do not allocate liability for freight charges the court must look beyond their express terms, to the conduct of the parties, in order to ascertain which party is liable for those charges. *See Steel Transport, Inc. v. Ryerson & Sons, Inc.*, No. 86 C 7328 (N.D.Ill. June 24, 1987)

[Available on WESTLAW, DCT database]; *see also States Marine Int'l., Inc. v. Seattle First Nat'l. Bank*, 524 F.2d 245, 247 (9th Cir.1975)[11]; *cf.* U.C.C. § 2–208(1).[12]

■ This Court first notes the following language from the Supreme Court's opinion in *Southern Pac. Transp. Co. v. Commercial Metals:* "The consignor, being the one with whom the contract is made, is originally liable for the carrier's charges...." 456 U.S. 336, 343, 102 S.Ct. 1815, 1820, 72 L.Ed.2d 114 (1982). Therefore, in the instant case, the Debtors are originally liable to Graham for the freight charges. This alone however does not absolve the consignees of liability to Graham. "The general rule is that a consignee becomes liable for freight charges when it accepts the freight." *Steel Transport, Inc. v. Joseph T. Ryerson & Sons, Inc.*, No. 86 C 7328 (N.D.Ill. June 24, 1987) [Available on WESTLAW, DCT database] (citing *C.F. Arrowhead Services, Inc.*, 614 F.Supp. at 1387). However as discussed above, that general rule will not apply if the parties agree to reallocate liability. *See Roll Form*, 662 F.2d at 153–54. The conduct of the parties to the instant proceeding evidences an arrangement establishing the exclusive liability of the Debtors to Graham.

This Court, in its *Penn–Dixie* opinion, looked to the following factors in concluding that the parties had agreed that the *consignor* would be *exclusively* liable for the shipping charges:

1) The carrier historically looked solely to the consignor for payment.

**11.** Although *States Marine Int'l., Inc.* involved an ocean shipper bound by the Shippers Act, the Court found the Interstate Commerce Act to be properly applicable on the issue of liability for freight charges. 524 F.2d at 248.

In that opinion the Court looked to several factors before determining that the consignee was not liable for freight charges. Specifically it noted that a consignee is *prima facie* liable for freight charges upon acceptance of the goods or upon exercising dominion and control over them. *Id.* The Court did not go any further in analyzing the law on this issue because under the facts of that case, it found that this threshold requirement had not been satisfied. However, had the facts been otherwise, and the goods accepted by the consignee, this would only have established the consignee's *prima facie* liability

as the Court noted, but it would not have been dispositive on the issue. *See e.g. Consolidated Freightways*, 442 F.2d at 61–62; *Roll Form*, 662 F.2d at 153–54.

**12.** U.C.C. § 2–208(1) states: "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement."

Although the U.C.C. only governs the sale of goods, its handling of course of performance is nonetheless instructive. *See William B. Tanner Co., Inc. v. WIOO, Inc.*, 528 F.2d 262, 270 (3rd Cir.1975).

2) This was the understanding of the parties as evidenced by every facet of their business relationship.

3) The consignor alone contracted with the carrier for shipping services.

4) Direct billing was effected from carrier to consignor, and that direct billing took place after delivery.

5) The consignor paid freight charges from its general funds.

6) Customer-consignees were billed by the consignors on a unitary basis (i.e. one net amount for delivered materials inclusive of freight) and they paid this single amount directly to the consignor.

7) The consignor deposited the sum received from the customer-consignees into its general accounts.

8) There was no request by, or agreement with, the carrier to segregate any portion of the funds received from customer-consignees, and none took place.

9) The two billing processes (i.e. Graham to Debtors and Debtors to consignees) were not synchronized so as to give an impression that the Debtors were mere conduits between carrier and consignee.

10) Bills of lading and delivery tickets were marked "prepaid" to indicate consignor's liability, and were signed by the carrier's agents without objection.

6 B.R. at 821.

The requisite facts found by this Court in *Penn–Dixie* to be sufficient to establish an agreement establishing the exclusive liability of the consignor to the carrier, are similarly present in the instant case. Graham billed Steel directly for freight charges after the goods were delivered. Tr. at 30. Graham's drivers signed "prepaid" bills of lading, evidencing the shipment. Stip. at paragraph 10. The "prepaid" notation as used in the transportation trade indicates that a shipper has paid or will pay freight charges to the carrier, or indicates that the shipper is at least responsible for such charges to the carrier. *See In re Penn–*

*Dixie*, 6 B.R. at 821 (carrier's delivery tickets marked "prepaid" indicated that carrier expected shipper to be responsible for freight charges); *Southern Pacific Transportation Company v. Campbell Soup Company*, 455 F.2d 1219, 1220 (8th Cir. 1972) ("the Railroad concedes that this notation signified that it would look to the shipper for payment of the freight charges"). Although the notation "prepaid" on a bill of lading may not in and of itself establish the existence of a contractual undertaking, it is one factor to be considered in making that determination.

Steel paid Graham for the freight charges from its general funds and billed its customers on a unitary basis. Stip at paragraph 14. The customers paid this single amount to Steel directly and LTV Steel deposited these payments into its general accounts. *Id.* At times Steel even absorbed part of the freight costs in order to be competitive with other steel manufacturers whose proximity to their customers enable them to offer steel with lower freight costs, a practice common in the industry. *Id.*

In addition to these activities, before the Filing Date Graham never collected or attempted to collect freight charges on "prepaid" shipments from the Debtors' consignees, where Steel had failed to pay. Tr. at paragraph 35–36. Although Graham stated that under these circumstances its normal practice was to pursue collection of such payments from consignees, (Stip. at 12), Graham concedes that for at least six (6) months prior to the Filing Date, the Debtors had been paying freight charges to Graham late on an average of about 30 days and that during this credit period Graham never sought to collect charges from the Debtors' consignees. (Stip. at paragraph 22 and Tr. at 35–36). This 30 day extension of credit period exceeded the ICA's 15–day credit period. Nonetheless, Graham continued to extend credit to Steel.[13]

---

**13.** This Court is aware of *Southern Pac. Transp. Co. v. Commercial Metals*, 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982). In that opinion the Supreme Court held that a common carrier's extension of credit to a consignor beyond the period prescribed by the ICC, could not be invoked by the consignor as a valid equitable defense in order to preclude collection

Based upon the conduct which is conceded to have defined the relations between the instant parties, combined with the foregoing analysis, this Court concludes that the Debtors and Graham are properly parties to an enforceable agreement pursuant to which the Debtors, as consignors, are exclusively liable to Graham for all freight charges.[14]

**(4) Graham's actions interfered with the Debtors' right to collect money from the consignees, in violation of § 362 of the Code, and Graham is enjoined by that section from continuing those actions.**

█ "Property of the estate" includes, with certain exceptions not relevant herein, all legal or equitable interests of the debtor in property as of the commencement of the case, wherever located and by whomever held. 11 U.S.C. § 541. The consignees entered into contracts to purchase the Debtors' steel products. Upon receiving the products they ordered, those consignees incurred an obligation to pay the Debt-

ors which is uncontested. This uncontested obligation is an account receivable in favor of the Debtors. The definition of "property of the estate" includes the Debtors' *right to collect* accounts receivable. *See Holland America Ins. Co. v. Succession of Roy,* 777 F.2d 992, 996 (5th Cir. 1985); *see also Steel Transport, Inc.,* No. 86 C 7328 [Available on WESTLAW, DCT database]. Monies collected from various consignees of the Debtors also qualify as property of the estate.

Section 362(a)(3) of the Code enjoins "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Based on the foregoing this Court finds that Graham's collection of freight charges from the Debtors' consignees amounts to a violation of § 362 and of this Court's restraining order.[15] Accordingly Graham is enjoined from pursuing the collection of its pre-petition freight charges directly from the Debtors' consignees. Instead Graham, like all other pre-petition

of those charges by the carrier from the consignor. The opinion explicitly states: "Metal's [(the consignor's)] failure to execute the nonrecourse provision in the bill of lading specifically placed upon it the primary liability for the freight charges. To permit SP's ([the carrier's)] violation of the credit regulations to be raised as an affirmative defense to its prima facie case would serve to nullify the enforceability of the nonrecourse clause." *Id.* at 352, 102 S.Ct. at 1825.

Accordingly, the Court recognized that had the consignor sought to absolve itself of liability to the carrier, upon the carrier's failure to collect freight charges from the consignee, the consignor could have entered into such an agreement with the carrier. The non-recourse provision represented the means by which such an agreement could be evidenced. Having failed to sign the non-recourse provision, the consignor could not now escape liability for freight charges.

The instant proceeding is distinguishable. Pursuant to the above discussion this Court concludes that the Debtor-consignors and Graham *did* have an agreement, evidenced by their course of conduct, affixing exclusive liability for freight charges upon the Debtor-consignors.

This Court is not holding that Graham's failure to collect freight charges from the Debtor-consignors within the prescribed credit period precludes Graham from recovering those charges. The Debtor-consignors concede their liability to Graham. The fact that Graham

failed to pursue collection of freight charges from consignees, even after expiration of the 15–day credit period, is merely being recognized as a single factor, which when combined with others, establishes a course of conduct. Graham's practice of pursuing payment of freight charges exclusively from the Debtors is one indicia of an agreement pursuant to which Graham's sole recourse is to recover payment of those charges from the Debtors'.

**14.** This Court finds the following recent statement by Judge Grady, in a case involving virtually the same facts, issues and the same Debtors, to be quite relevant to the instant issue: "For ST [(the carrier)] to look to Ryerson [(the consignee)] for payment would be to look to LTV's accounts receivable, *which are the property of LTV's estate....* We do not think the rule that a solvent co-debtor's assets [(i.e. the consignee's assets)] can satisfy a debt applies to situations where the relationship between the co-debtors [(i.e. the debtor-consignor and the consignee)] is such that to satisfy the debt against the solvent debtor would be to diminish the estate of the insolvent one. That would be the result if we allowed ST [(the carrier)] to proceed against Ryerson [(the consignee)]." Graham's actions in the instant case would yield the same result condemned by Judge Grady in that action. *Steel Transport, Inc.,* No. 86 C 7328 [Available on WESTLAW, DCT].

**15.** *See* footnote 1.

creditors, has the right to file a claim against the Debtors' estate to the extent that it is owed money by the Debtors for debts incurred pre-petition.

The Debtors contend that various customers have stated that they have paid Graham the freight charges it demanded. However without a specific accounting, the Debtors cannot determine the amount collected by Graham. Accordingly, to the extent that Graham is already in possession of pre-petition freight charges collected in violation of § 362, it shall account for all monies so collected and turn that sum over to the Debtors'.

The Debtors also allege that Graham's violation of § 362 amounts to an intentional interference with the Debtors' business relationship with its customers. Therefore the Debtors seek damages stemming from that conduct.

■ Section 362(h) of the Code states: "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages." Graham's collection of "prepaid" freight charges directly from consignees, amounts to a willful violation of both the stay imposed by § 362 and of this Court's Restraining Order.

There is no doubt that Graham was aware of the Debtors' bankruptcy filing prior to its actions.[16] In addition this Court notes that David Graham Co. appeared as a named defendant in the *Roll Form* proceeding. 662 F.2d 150. Therefore its familiarity with the law in this jurisdiction can be assumed.

It is well recognized that individuals "subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed even if they have proper grounds to object to the order." *GTE Sylvania, Inc. v. Consumer Union*, 445 U.S. 375, 376, 100 S.Ct. 1194, 1201, 63 L.Ed.2d 467 (1980). Thus, if

Graham had any questions as to the applicability of the automatic stay under the instant set of facts, the proper course of action for it was to initially raise that issue before *this Court*. *See Fidelity Mortg. Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir.1976), *cert. denied* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977). Graham however failed to do so and as a result acted in contravention of § 362, the Restraining Order and precedent within this Circuit. Graham by failing to follow procedural prerequisites acted at its peril, and is therefore liable to the Debtors for attorneys' fees and costs associated with this matter.

Accordingly, it is hereby found and determined that:

1) Section 362 of the Code, and this Court's Restraining Order, both stay Graham from continuing its collection actions against the Debtors' consignees;

2) Graham is in possession of estate property to the extent that it has collected money from the Debtors' consignees as payment for prepaid freight charges;

3) Graham shall account for all monies it has so collected and it shall turn those funds over to the Debtors; and

4) The Debtors shall recover actual damages, including costs and attorneys' fees, which amount shall be determined at a further hearing to be scheduled with the Court.

It is SO ORDERED.

---

**16.** The first sentence of the July 17, 1986 letter which Graham sent to the Debtors' consignees states: "As you may be aware, LTV Steel and its subsidiaries filed Chapter 11 bankruptcy on July 17, 1986."