**In re ALUMNI ENTERPRISES INCORPORATED, Debtor.**

**Mark S. WALLACH, Trustee, Plaintiff,**

**v.**

**REO DISTRIBUTING SERVICES, INC., Defendant.**

Bankruptcy No. 93–13707 B.

Adv. No. 94–1110 B.

United States Bankruptcy Court, W.D. New York.

Feb. 7, 1996.

Penney, Maier, Wallach, & Crowe, Buffalo, New York, for Plaintiff.

Saperston & Day, P.C. (Paul Peters, of counsel), Buffalo, New York, for Defendant.

CARL L. BUCKI, Bankruptcy Judge.

The Chapter 7 trustee commenced this adversary proceeding to recover an allegedly preferential payment which a customer of the debtor made to the defendant from monies that would otherwise have become owed to the debtor. Contending that the payor was jointly liable for the underlying obligation, the defendant argues that that joint liability precludes a demonstration of the requirements for a preference as set forth in 11 U.S.C. § 547(b).

Prior to the filing of its bankruptcy petition on December 16, 1993, Alumni Enterprises Incorporated ("Alumni") had regularly engaged Reo Distributing Services, Inc. ("Reo"), to transport plastic product to Lerio Corporation of Mobile, Alabama ("Lerio"). Unfortunately, financial circumstances caused Alumni to become delinquent in the payment of transportation charges. By September of 1993, at a time less than 90 days prior to the debtor's bankruptcy filing, Alumni owed Reo on nine outstanding invoices. Alumni did pay the oldest of these invoices in the amount of $650 on September 20, but was unable to satisfy the remaining eight obligations. Although Reo had initially issued its invoices to Alumni, this carrier began sometime in October to seek collection from Lerio. In particular, the trustee has represented, upon information and belief, that Reo refused to deliver a shipment of product unless Lerio paid the delinquent bills that had been rendered to the Debtor. This pressure apparently caused Lerio to contact Alumni, which then authorized Lerio to deduct the delinquent shipping charges from the balance that Lerio would owe for the product whose delivery had been withheld. Based upon this authorization, Lerio paid $5,725 to Reo on November 5. In this preference action, Alumni's trustee seeks to recover both the debtor's direct payment on September 20, and the payment which Lerio made pursuant to the debtor's instruction. Asserting the absence of any material issues of fact, Alumni and Reo have filed cross motions for summary judgment.

Reo now acknowledges the preferential character of the first transfer of $650. Rather, the focus of controversy is the second payment from Lerio Corporation. The trustee contends that this second payment is preferential because it represented a transfer from the debtor's assets, in this instance by reason of a deduction from an account receivable. Reo responds that its shipping bill was a joint liability of both Alumni as consignor and Lerio as consignee. Because the payment satisfied an obligation for which Lerio was itself fully liable, Reo would conclude that the transfer was not of the debtor's property, that payment was on account of an antecedent debt of Lerio rather than the

debtor, and that the payment did not enable Reo to obtain more than it would have received through a Chapter 7 liquidation. Both parties concede that the Interstate Commerce Act applies to the transactions now in dispute.[1]

At common law, the consignor assumes primary liability for shipping charges. *A/S Dampskibsselskabet Torm v. Beaumont Oil Ltd.*, 927 F.2d 713 (2nd Cir.1991). Then, upon acceptance of delivery, the consignee becomes an additional obligor for payment of those expenses. *New York Cent. R.R. v. Warren Ross Lumber Co.*, 234 N.Y. 261, 265, 137 N.E. 324 (1922) These rules are subject, however, to modification either by statute or agreement. One such statutory exception is the Interstate Commerce Act, which Congress enacted in 1887 "to secure equality of rates to all and to destroy favoritism." *In re Penn–Dixie Steel Corp.*, 6 B.R. 817, 820 (Bankr.S.D.N.Y.1980), *aff'd* 10 B.R. 878 (S.D.N.Y.1981). Under its provisions, the liabilities of consignor and consignee are generally extended not only to billed charges, but to the full rate that is set forth in any filed tariffs. *Pittsburgh, C., C. & St. L. Ry. v. Fink*, 250 U.S. 577, 581–82, 40 S.Ct. 27, 27–28, 63 L.Ed. 1151 (1919). In this way, Congress sought to assure that each interstate carrier would accord uniform and non-discriminatory treatment to its customers. The liability of a consignee is not absolute, however. In the absence of discriminatory intent, the parties may allocate their respective liabilities by agreement. It is "where parties fail to agree, or where discriminatory practices are present, [that] the Interstate Commerce Act will bind the consignee to pay freight charges to the carrier on goods he accepts, this obligation being independent of the consignor's own obligations." *In re Roll*

*Form Products, Inc.*, 662 F.2d 150, 154 (2nd Cir.1981).

Designed to assure rate equality, the Interstate Commerce Act was never a guaranty of collection. Published tariffs "did not provide when or by whom the payment should be made. As to these matters [the parties] were left free to contract, subject to the rule which prohibits discrimination." *Louisville & Nashville R.R. v. Central Iron & Coal Co.*, 265 U.S. 59, 66, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924). The concern for rate equality is not implicated, however, when the consignor agrees with the carrier to assume responsibility for the full and proper charge. In that event, consignee liability would serve not to assure application of the tariff, but to effect collection of a bad debt.

The parties acknowledge that in the absence of agreement between Alumni as consignor and Reo as carrier, Lerio as consignee became liable for shipping charges upon acceptance of delivery. The central issue is whether this outcome changes by reason of some agreement. The trustee references no specific written instrument, but asserts that the Court may imply an agreement from the conduct of the parties. Although such an inference may be drawn in certain circumstances, the present facts fail to demonstrate an intent to modify the customary rule of consignee liability.

The trustee urges reliance upon *In re Penn–Dixie Steel Corp.*, 6 B.R. 817 (Bankr. S.D.N.Y.1980), *aff'd*, 10 B.R. 878 (S.D.N.Y. 1981) and *In re Chateaugay Corp.*, 78 B.R. 713 (Bankr.S.D.N.Y.1987). In both cases, Judge Lifland inferred the existence of an agreement to waive consignee liability from ten factors.[2] On the present motion for sum-

---

1. Subsequent to the transactions at issue, Congress enacted substantial amendments to the Interstate Commerce Act. ICC Termination Act of 1995, P.L. 104–88, 109 Stat. 803 (December 29, 1995). The new statutory framework has, however, retained the provisions that are of relevance to this decision. *Compare* 49 U.S.C.A. § 10743(a) (West Supp.1995) *with* P.L. 104–88 § 103, 109 Stat. 873 (1995) (to be codified as 49 U.S.C. § 13707).

2. These ten factors are as follows: "1) The carrier historically looked solely to the consignor for

payment. 2) This was the understanding of the parties as evidenced by every facet of their business relationship. 3) The consignor alone contracted with the carrier for shipping services. 4) Direct billing was effected from carrier to consignor, and that direct billing took place after delivery. 5) The consignor paid freight charges from its general funds. 6) Customer-consignees were billed by the consignors on a unitary basis (i.e. one net amount for delivered materials inclusive of freight) and they paid this single amount directly to the consignor. 7) The consignor deposited the sum received from the cus-

mary judgment, the Court has received minimal or equivocal evidence regarding most of these criteria. However, it is clear that the present circumstances fail to satisfy at least two of the factors. In contradiction to these precedents, Alumni did not pay Reo from its general account in all instances, and the bills of lading were never marked as "prepaid" to indicate the consignor's exclusive liability.[3] These distinctions are critical, for they demonstrate the absence of a consistent practice to rely exclusively upon Alumni for payment of freight charges.

The needs of commerce demand clear standards. One such standard is the imposition of consignee liability upon acceptance of goods. A waiver of that liability requires either a written understanding or some unequivocal substitute. At best, Alumni's conduct was ambiguous as to the question of intent to rely solely upon the consignor's credit. Indeed, without a "prepaid" notation, the bill of lading was indicative of consignee responsibility for this indebtedness. The Court must assume, therefore, that Lerio shared joint liability with Alumni for payment of Reo's freight charges.

Section 547(b) of the Bankruptcy Code sets forth the basic requirements for a preference recovery. Before reciting five specific conditions, the statute states that the trustee's avoidance power applies fundamentally to "any transfer of an interest of the debtor in property." The trustee contends that Lerio's payment represented an advance from the debtor's interest in an account receivable. At the time of payment, however, Reo was refusing to complete delivery unless its outstanding invoices were satisfied. Until the

goods were delivered, Lerio would have no obligation to pay Alumni. Indeed, Lerio might have possessed a claim against Alumni by reason of the failure to fulfill a purchase order. Accordingly, before Lerio's payment to Reo, Alumni owned no receivable against which to credit an offset. Reo's collection efforts are more accurately characterized as an attempt to secure recovery from a joint obligor, and not as an attempt to obtain a piece of what Lerio owed to Alumni.

In contrast to proceedings under Chapter 13,[4] creditors of a Chapter 11 debtor may freely seek recovery from any joint obligor which has not itself obtained protection under the Bankruptcy Code. So long as it derives from sources other than a property interest of the debtor, the payment is not a preference as defined in 11 U.S.C. § 547. Though designed to induce collection, Reo's actions did not compel any particular path to this result. Its pressure might alternatively have caused Lerio to satisfy the claim or to pressure Alumni into a direct preferential payment of the obligation. Exposed to liability for the freight charges that Alumni had agreed to assume, Lerio chose a middle course: to arrange recoupment of the payment from Alumni. As between Alumni and Lerio, the offset arrangement was a contemporaneous transfer to resolve a contractual breach which threatened Lerio's receipt of product and, for Alumni, the completion of a sale and the generation of a new receivable. Without this settlement, Alumni would have retained title to undelivered merchandise having an uncertain value upon liquidation from a carrier's warehouse and after satisfaction of the carrier's lien. That Reo was a

---

tomer-consignees into its general accounts. 8) There was no request by, or agreement with, the carrier to segregate any portion of the funds received from customer-consignees, and none took place. 9) The two billing processes (i.e. [carrier] to Debtors and Debtors to consignees) were not synchronized so as to give an impression that the Debtors were mere conduits between carrier and consignee. 10) Bills of lading and delivery tickets were marked 'prepaid' to indicate consignor's liability, and were signed by the carrier's agents without objection." *In re Chateaugay Corp.,* 78 B.R. at 723–724.

3. In this context, "prepaid" is a term of art used to denote that the consignor has assumed re-

sponsibility for payment. The trustee has provided copies of 13 bills of lading, only one of which is marked as "prepaid". However, this one bill of lading appears to relate to different accounts, as there is nothing on it to indicate that it has a relation to any of the nine shipments to Lerio.

4. Section 1301 of the Bankruptcy Code imposes a co-debtor stay with respect to actions to collect most consumer obligations of a debtor in Chapter 13. No parallel provision exists in either Chapter 7 or Chapter 11. Even in Chapter 13, the co-debtor stay expressly excludes debts arising in the ordinary course of business activity.

beneficiary of this arrangement cannot change the fact that it involved no transfer of estate assets other than for contemporaneous value.

The Trustee's motion for summary judgment is granted, with costs, to the extent that the complaint seeks to recover the debtor's direct payment to Reo in the amount of $650, together with interest from April 1, 1994. In all other respects, the trustee's motion is denied. The defendant's motion for summary judgment is granted with respect to that portion of the trustee's complaint which seeks to avoid Lerio's payment of $5,725. The clerk is directed to enter judgment in accord with this decision.

So ordered.